Ronnie **HAWKINS, individually, and as the representative of the class of persons defined in averment 16, Plaintiff,**

v.

Joan **COMPARET–CASSANI; the Los Angeles Municipal Court; the Los Angeles Superior Court; Sherman Block; County of Los Angeles, Defendants.**

No. CV 98–5605 DDP (CWx).

United States District Court,
C.D. California.

Jan. 25, 1999.

Stephen Yagman, Marion R. Yagman, Joseph Reichmann, Yagman & Yagman, P.C., Venice Beach, CA, Richard H. Millard, Los Angeles, CA, and Kathryn Bloomfield, Studio City, CA, for Plaintiff.

Kevin C. Brazile, Principal Deputy County Counsel, Lloyd W. Pellman, County Counsel, Los Angeles, CA, for Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; GRANTING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION; AND GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

PREGERSON, District Judge.

The defendants' motion to dismiss and the plaintiff's motions for class certification and for preliminary injunction came before the Court for oral argument on November 16, 1998. After reviewing and considering the materials submitted by the parties and hearing oral argument, the Court grants in part and denies in part the defendants' motion to dismiss and grants plaintiff's motions for class certification and for the issuance of a preliminary injunction.

## BACKGROUND

The plaintiff, Ronnie Hawkins ("Hawkins"), was tried and convicted of one count of felony burglary and one count of felony theft in April 1998 before Los Angeles County Municipal Court Judge Comparet–Cassani, a named defendant in this case. On June 30, 1998, Hawkins appeared before Judge Comparet–Cassani to have a motion heard and for sentencing. Due to alleged threats of violence to the Court, the Los Angeles County Sheriff received a court order to place a "stun belt" on Hawkins. At this hearing, Judge Comparet–Cassani claims that Hawkins made several statements out of order and acted in a generally disruptive manner. As a result, Judge Comparet–Cassani ordered a courtroom deputy to activate the stun belt.

The stun belt is manufactured by Stun Tech, Inc., an Ohio corporation. Stun Tech claims to have sold about 1,400 belts nationwide to various law enforcement agencies and courts. Stun Tech claims that the belts have been worn on over 50,000 occasions, out of which they have been activated on 27 occasions. Stun Tech claims that it has sold these devices to the Los Angeles County Sheriff's Department.

Hawkins alleges that the stun belt operates by delivering a current of 50,000 volts of electricity. This shock "stuns" the victim into submission.

Judge Comparet–Cassani has recused herself from further proceedings in Hawkins's criminal matter. Furthermore, when Hawkins appeared again in municipal court on July 29, 1998, he was not required to and did not wear a stun belt.

The complaint requests the following relief: (1) a declaratory judgment that using the stun belt is unconstitutional; (2) an injunction prohibiting the defendants from using the stun belt; (3) compensatory damages against all defendants, punitive damages against all defendants except Los Angeles County, and punitive damages of $50,000,000

against Judge Comparet–Cassani; and (4) costs of the suit and attorney's fees.

## MOTIONS AT ISSUE

First, the defendants move under Federal Rule 12(b)(6) to dismiss all claims against all defendants. Defendants argue that several defendants are immune from suit and that Hawkins failed to state a claim upon which relief can be granted. Additionally, the defendants move to dismiss counts I, II, IV and X of the plaintiff's amended complaint for failure to state a claim.

Second, Hawkins moves that this Court issue a preliminary injunction to prevent any Los Angeles County Municipal or Superior Court Judge or the Los Angeles County Sheriff's Department from using the stun belt against Hawkins or other members of the class, if certified.

Third, Hawkins moves to certify a class consisting of (1) all individuals who are in the custody of the Los Angeles County Sheriff's Department, (2) persons who will be brought before a Los Angeles County Superior or Municipal Court, and (3) any person subjected to wearing a stun belt.

## DISCUSSION

### I. Defendants' motion to dismiss—Constitutional Constraints on Hawkins's action

#### A. *Subject matter jurisdiction*

■ Article III dictates that federal courts are courts of limited jurisdiction. Before a federal court can hear a case it must determine that there is an actual case or controversy and that the claim falls within the subject matter of the court. Here, Hawkins bases his claims on a federal statute, 42 U.S.C. § 1983. This claim is sufficient to establish subject matter jurisdiction.

#### 1. *Eleventh Amendment issues*

■ The Eleventh Amendment bars individuals from bringing civil suits "which seek either damages or injunctive relief against a state, an 'arm of the state,' its instrumentalities, or its agencies." *Franceschi v. Schwartz*, 57 F.3d 828, 831 (9th Cir. 1995). "In determining whether an entity is an arm of the state, [a federal court] look[s] to 'the way state law treats the entity.'" *Id.,*

*quoting Mitchell v. Los Angeles Community College Dist.*, 861 F.2d 198, 201 (9th Cir. 1988).

In evaluating the municipal and superior courts in California, the Ninth Circuit has held that these bodies are arms of the state and are "protected from ... lawsuit by Eleventh Amendment immunity." *Id.; Greater Los Angeles Council on Deafness v. Zolin,* 812 F.2d 1103, 1110 (9th Cir.1987).

■ Therefore, the claims for damages and injunctive relief against both the Los Angeles Municipal Court and the Los Angeles Superior Court are DISMISSED based on Eleventh Amendment immunity.

#### B. *Standing*

■ In the motion for class certification and the motion for preliminary injunction, the plaintiff has the burden of establishing that he has the appropriate Article III standing to bring such motions. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 52–53, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (discussing standing of named plaintiff as prerequisite to certifying class); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (discussing standing requirements for plaintiff seeking injunctive relief).

■ Generally, when seeking retrospective relief Article III standing requires three elements. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). First, "the plaintiff must have suffered an 'injury in fact.'" *Id.* "Second, there must be a causal connection between the injury and the conduct complained of." *Id.* "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561, 112 S.Ct. 2130.

■ Additionally, if a party seeks injunctive relief under § 1983 then there is a separate standing requirement. *See Lyons*, 461 U.S. at 105–06, 103 S.Ct. 1660. Under *Lyons*, the party seeking an injunction must show that there is a "real or immediate threat that the plaintiff will be wronged again—'a likelihood of substantial and immediate irreparable injury.'" *Id.* at 111, 103 S.Ct. 1660, *quoting O'Shea v. Littleton*, 414

U.S. 488, 502, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). Furthermore, this "threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Id.* at 102, 103 S.Ct. 1660.

■ The Ninth Circuit, however, has created an exception to the *Lyons* standard. *See Nava v. City of Dublin,* 121 F.3d 453, 456 (9th Cir.1997) (discussing development of Ninth Circuit authority creating exception). This exception states that the law of the Ninth Circuit "is that once a plaintiff establishes standing to seek damages, a court need not undertake a separate standing inquiry for equitable relief so long as the damages and equitable claims are predicated on the same operative facts and legal theories." *Id.* Although the *Nava* court is reluctant to follow this line of authority and questions its validity in light of the statements the Supreme Court made in *Lyons,* it acknowledges that it is the law in this circuit, and it is "obligated to follow this rule." *Id.*

Here, Hawkins states a claim for damages and injunctive relief arising out of the same operative facts and legal theories. Therefore, under *Nava* Hawkins has a right to seek injunctive relief if the plaintiff has standing to seek damages.

■ Clearly Hawkins meets the *Lujan* test for standing. Hawkins claims an actual injury, namely that the defendants violated Hawkins's Eighth Amendment rights by using the stun belt.[1] Furthermore, Hawkins claims that the defendants caused the violation when they used the stun belt on him. Finally, Hawkins requests compensatory and punitive damages resulting from use of the stun belt. Under *Lujan* these allegations are sufficient to establish standing to bring a claim for damages. Consequently, under *Nava,* Hawkins has met his burden in establishing standing to bring his claim for injunctive relief.

### C. *Judicial immunity from suit for Judge Comparet–Cassani*

#### 1. *Eleventh Amendment immunity*

■ Hawkins is suing Judge Comparet–Cassani as an individual and in her official capacity. The suit against Judge Comparet–Cassani in her official capacity is considered a suit against the entity—the Los Angeles County Municipal Court. *See Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). As explained above, this entity has Eleventh Amendment immunity. (*See supra* Part I–A–1.) In an official capacity action, such as this one, the Eleventh Amendment immunity applies to damages, but not injunctive relief. *Graham,* 473 U.S. at 167 n. 14, 105 S.Ct. 3099.

■ Therefore, the claims for damages against Judge Comparet–Cassani in her official capacity are DISMISSED.

#### 2. *Judicial immunity*

■ Judges have absolute immunity from suits seeking damages arising from the performance of their official duties. There are only two circumstances in which a judicial officer will not have judicial immunity. These are where the judicial officer did not perform a judicial act and where the judicial officer acted in clear absence of all jurisdiction. *See Stump v. Sparkman,* 435 U.S. 349, 356–57, 360, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). Additionally, this immunity does not apply to claims for injunctive relief.

##### a. *Whether the event in question was a judicial act*

■ The Supreme Court defines a judicial act as one that "relate[s] to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." *Mireles v. Waco,* 502 U.S. 9, 12, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991). The Court continued that "the relevant inquiry is the 'nature' and 'function' of the act, not the 'act itself.' In other words, we look to the particular act's relation to a general function normally performed by a judge." *Id.* at 13, 112 S.Ct. 286. Furthermore, "a judge 'will not be deprived of immunity because the action he took was in error ... or was in excess of authority.'" *Id., quoting Stump,* 435 U.S. at

---

1. The term "use" is susceptible to a range of meanings. The Court construes "use" to include either placement or activation of the stun belt on a prisoner.

356, 98 S.Ct. 1099. Likewise, the Supreme Court has stated that "judicial immunity is not overcome by allegations of bad faith or malice." *Id.* at 11, 112 S.Ct. 286.

This is a motion to dismiss. The Court must accept all allegations of the complaint as true. The plaintiff argues that the judge did not commit a judicial act. The plaintiff argues that instead of attempting to maintain order in the courtroom, the judge sought to silence speech. Further, the plaintiff argues that the judge acted in bad faith and with punitive intentions.[2]

██ Accepting these as true, Judge Comparet–Cassani's act remains a judicial act. This is because the Court must look to "the nature of the act itself, i.e. whether it is a function normally performed by a judge." *Mireles,* 502 U.S. at 12, 112 S.Ct. 286. California law defines the functions normally performed by state court judges. *See* Cal. Civ. P.Code §§ 128, 177, 187. Section 128 states that, "[e]very court shall have the power... (1) To preserve and enforce order in its immediate presence. (2) To enforce order in the proceedings before it..." *Id.*

It is undisputed that Hawkins was a criminal defendant appearing before Judge Comparet–Cassani for sentencing and to have a motion heard. It is undisputed that the judge ordered the belt placed on Hawkins before the proceeding and ordered a courtroom deputy to activate the belt during the proceeding. The judge's intent in making these orders is not relevant to the analysis of whether the act is a judicial act because it is the nature of the act itself which controls. *See Mireles,* 502 U.S. at 11, 12, 112 S.Ct. 286. Even if the judge acted improperly to silence speech with punitive intentions, the act was within the scope of § 128. The nature of this act is to control a party in a case before Judge Comparet–Cassani. This is an act

"[t]o preserve and enforce order in [the court's] immediate presence." Cal. Civ. P.Code § 128. The methods used or the judge's intentions are not factors in examining the nature of the act itself. *See Mireles,* 502 U.S. at 11–13, 112 S.Ct. 286.

b. *Whether the judge acted in clear absence of jurisdiction*

██ Generally, "[j]urisdiction is construed broadly where the issue is the immunity of a judge." *Franceschi,* 57 F.3d at 830, *see also Stump,* 435 U.S. at 356–57, 98 S.Ct. 1099. Furthermore, the Supreme Court has stated that even if a judge acted in excess of his authority, "such an action—taken in the very aid of the judge's jurisdiction over a matter before him—cannot be said to have been taken in the absence of jurisdiction." *Mireles,* 502 U.S. at 13, 112 S.Ct. 286.

Here Judge Comparet–Cassani was hearing a motion in a criminal matter. During this proceeding she ordered a sheriff's deputy to activate the stun belt. California law allows judges to take necessary steps to control individuals appearing in proceedings before the court. *See* Cal. Civ. P.Code § 128. Ordering measures to be taken against a party appearing before the court is something judges are empowered to do. *Mireles* and *Stump* require a finding that the judge did not act in absence of any jurisdiction.

The plaintiff's allegations are serious. However, *Mireles* and *Stump* are based upon sound policy decisions. It is important that the judicial function not be chilled. This would be the inevitable result of lessening the scope of judicial immunity. Lawsuits or the threat of lawsuits against judicial officers would be used to gain a tactical advantage in litigation. Rather than compromising the judicial function in this way, there are administrative remedies available to address alleged judicial misconduct.[3]

---

2. Although the Court does not consider Judge Comparet–Cassani's factual assertions for the purposes of this motion, the Court notes that she disputes the plaintiff's allegations. She argues that she ordered a sheriff's deputy to activate the stun to maintain order and security in the courtroom. Circuit courts have found that taking security measures in the courtroom is a valid judicial act. *See, e.g., Martinez v. Winner,* 771 F.2d 424, 434–35 (10th Cir.), *modified,* 778 F.2d 553 (10th Cir.1985), *action found moot,* 800 F.2d 230 (10th Cir.1986).

3. For example, the California Constitution includes provisions creating the Commission on Judicial Performance. Cal. Const. Art. 6, §§ 8, 18, 18.1, 18.5. The Commission on Judicial Performance is the body charged with the duty of overseeing judicial performance in California. The Commission may impose a wide variety of punishments when a judge acts inappropriately. These range from admonishing or censuring the judge to removing the judge from office. *Id.* § 18.

For these reasons, the Court concludes that Judge Comparet–Cassani did not act in the clear absence of all jurisdiction. Judge Comparet–Cassani has absolute immunity from claims for damages for her actions in this case. Therefore, all claims for damages against Judge Comparet–Cassani are DISMISSED.

### D. Quasi-judicial immunity for Deputy Sheriff Donna Jacobs

 Another type of immunity is quasi-judicial immunity. Like absolute judicial immunity, quasi-judicial immunity provides immunity from damages but not injunctive relief. This immunity is afforded to court personnel "who, although not judicial officers, act 'under the command of a court decree or explicit instructions from a judge.'" 1B Martin A. Schwartz & John E. Kirklin, *Section 1983 Litigation: Claims and Defenses* § 9.5 (1997), *quoting Valdez v. Denver*, 878 F.2d 1285, 1286 (10th Cir.1989). The Ninth Circuit has adopted the theory of quasi-judicial immunity for individuals carrying out judicial orders. *See Coverdell v. Dept. of Social & Health Services*, 834 F.2d 758, 765 (9th Cir.1987). The rationale for this immunity is that "[t]he fearless and unhesitating execution of court orders is essential if the court's authority and ability to function are to remain uncompromised." *Id.* Furthermore, "deny[ing] him this [absolute] immunity would seriously encroach on the judicial immunity already recognized by the Supreme Court." *Id., quoting Kermit Constr. Corp. v. Banco Credito Y Ahorro Ponceno*, 547 F.2d 1, 3 (1st Cir.1976).

 Here Deputy Jacobs activated the device on the direct order of a judge sitting on the bench. The officer executed the order immediately. As the *Coverdell* court noted, denying absolute immunity in these cases would make the officer "'a lightning rod for harassing litigation aimed at judicial orders' [and] would seriously imperil the effectiveness of state [actions]." 834 F.2d at 765, *quoting Kermit Constr.*, 547 F.2d at 3.

For these reasons claims for damages against Deputy Jacobs are DISMISSED.

### II. Defendants' motion to dismiss

The remaining claims are claims for damages and injunctive relief against Los Angeles County, the Los Angeles County Sheriff as an individual [4] and in his official capacity, claims for injunctive relief against Deputy Sheriff Donna Jacobs as an individual and in her official capacity, and claims for injunctive relief against Judge Comparet–Cassani as an individual and in her official capacity. The defendants have moved to dismiss all of these claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

### A. Legal standard

Dismissal under Rule 12(b)(6) is appropriate when it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations set forth in the complaint. *See Newman v. Universal Pictures*, 813 F.2d 1519, 1521–22 (9th Cir.1987). The court must view all allegations in the complaint in the light most favorable to the non movant and must accept all material allegations—as well as any reasonable inferences to be drawn from them—as true. *See North Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir.1983).

### B. Discussion

#### 1. Claims against Sheriff based on Sheriff's policy

 Hawkins asserts that the Los Angeles County Sheriff is liable for damages resulting from the use of the stun belt on Hawkins because the Sheriff's Department has a policy of requesting that courts grant it permission to have disruptive criminal defendants wear stun belts.

California law mandates that the police must have a court order to have a prisoner wear a stun belt. *See People v. Garcia*, 56 Cal.App.4th 1349, 66 Cal.Rptr.2d 350, 354–55

---

4. The Court notes that former Los Angeles County Sheriff Sherman Block has recently passed away. The Court notes that the claims for damages against Sheriff Block in his individual capacity can survive by naming his executor, but the claims for injunctive relief against him in his individual capacity are moot. The Court assumes for the purposes of the arguments here that the plaintiff will take the necessary steps to supplement or amend his complaint to substitute the new Los Angeles County Sheriff under Federal Rule of Civil Procedure 25.

(Cal.Ct.App.1997). Specifically, the *Garcia* court stated that its "holding does not mean that electronic belt devices may be employed at the simple request of the sheriff or prosecutor even if they will prevent violence, disruption of the court, or escape in 100 percent of the cases. There must be a showing of good cause based upon a totality of the facts and circumstances. The decision whether to require 'belting' is addressed to the trial court's sound discretion." *Id.*

Hawkins argues that the Sheriff's Department has a policy that it will seek a court order to have a stun belt placed on prisoners who might "engage[ ] in conduct that might upset a judicial officer." Hawkins alleges that this policy violates rights these prisoners have under the United States Constitution and various international treaties to which the United States is a signatory.

There are, however, some significant potential problems with the plaintiff's approach. First, under the rationales of *McMillian v. Monroe County, Ala.*, 520 U.S. 781, 117 S.Ct. 1734, 1737, 138 L.Ed.2d 1 (1997) and *Pitts v. County of Kern*, 17 Cal.4th 340, 70 Cal. Rptr.2d 823, 833–34, 949 P.2d 920 (Cal.1998), it appears that the Sheriff was acting as a state rather than a county policymaker during this incident. In *McMillian*, the United States Supreme Court examined Alabama law and found that Alabama sheriffs were state rather than county policymakers for the purpose of § 1983 and *Monell* claims. *See McMillian*, 117 S.Ct. at 1737. In *Pitts*, the California Supreme Court applied the rational of *McMillian* to California district attorneys and found that they were state rather than county policymakers when they prosecute crimes and hire and train staff. *See Pitts*, 70 Cal.Rptr.2d at 840, 949 P.2d 920. However, all of the provisions of California law that the California Supreme Court relied upon discuss the scope of authority and supervisory roles of both the county district attorneys and the county sheriffs. *See* Cal. Const. Art. V, § 13; Cal. Gov.Code § 12550; Cal.Penal Code § 923.

Moreover, here the Sheriff was providing security to a state court at the time of the incident. As explained above, the Los Angeles municipal and superior courts are instruments of the State and are exempt from suit in federal courts by the Eleventh Amendment. (*See supra* Parts I–A–1, I–C.)

Therefore, the Court finds that, in light of *Pitts* and given the activities in which the Sheriff was engaged at the time of the incident, a California court would find that the Sheriff was acting as a state rather than a county policymaker. *Accord County of Los Angeles v. Superior Court*, 68 Cal.App.4th 1166, 80 Cal.Rptr.2d 860, 861 (Cal.Ct.App. 1998) (stating sheriff acts as a state official in governing release of prisoners). Further the Sheriff may not be sued in his official capacity for damages because in this context he is a state officer. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

Therefore, all claims for damages against the Los Angeles County Sheriff in his official capacity are DISMISSED.

Second, a suit based on the Sheriff's individual capacity may fail to state a claim because it is unclear that the Sheriff's policy of seeking a judicial order in absence of any misrepresentations would be unconstitutional. The Court, however, may not decide this issue given the current state of the proceedings. This is a motion under Rule 12(b)(6). Accordingly, the Court must view all allegations in the complaint in the light most favorable to the non movant and must accept all material allegations—as well as any reasonable inferences to be drawn from them—as true. *North Star*, 720 F.2d at 581. The Court finds that "it is possible to hypothesize facts, consistent with the complaint, that would make out a claim." *Graehling v. Village of Lombard, Ill.*, 58 F.3d 295, 297 (7th Cir.1995).

The defendants also argue that the Sheriff is not liable for these acts in his individual capacity because he was not personally involved in the incident and he did not personally supervise the deputy who activated the stun belt. If activation was the only injury which the plaintiff complained about then this defense might succeed because there is no vicarious liability in § 1983 actions. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989). However, here the plaintiff complains that the Sheriff maintains an unconstitutional policy in his department

to use these devices in a manner that violates the prisoners' constitutional rights. Therefore, the allegation that the Sheriff had a policy to place stun belts on certain prisoners states a claim sufficient to survive a motion to dismiss.

Therefore, the defendants' motion to dismiss the remaining claims against the Los Angeles County Sheriff in his individual capacity is DENIED.

2. *Claims against Los Angeles County based on acts of municipal court judge and Los Angeles Sheriff*

■■■■■ Municipalities face liability for acts under § 1983 that "the municipality has officially sanctioned or ordered." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). This means that the municipality must have officially sanctioned the conduct through policies "set by the government's lawmakers, 'or by those whose edicts or acts may fairly be said to represent official policy' ". *McMillian,* 117 S.Ct. at 1736, *quoting Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Further, "only municipal officials with 'final policymaking authority' may subject the municipality to [section] 1983 liability." *Meek v. County of Riverside,* 982 F.Supp. 1410, 1414 (C.D.Cal.1997), *quoting Praprotnik,* 485 U.S. at 123, 108 S.Ct. 915. State law determines whether particular officials have such authority. *See id.* The crucial factor in determining whether a municipality is liable under § 1983 "is whether under state law the acts in question were performed under the municipality's or the state's authority." *Eggar v. City of Livingston,* 40 F.3d 312, 314 (9th Cir.1994).

■■■ The Ninth Circuit has held that municipal courts are arms of the state. *See Franceschi,* 57 F.3d at 831. This means that "counties have absolutely no influence or control over the manner in which a municipal court judge performs his or her duties." *County of Sonoma v. Workers' Compensation Appeals Board,* 222 Cal.App.3d 1133, 272 Cal.Rptr. 297, 298 (Cal.Ct.App.1990). Therefore, when Judge Comparet–Cassani ordered the stun belt used she was acting on behalf of the state rather than the county. She was not a "county policymaker" for the purposes of § 1983 liability. *Accord Meek,* 982 F.Supp. at 1414–15 (finding municipal court judges are state rather than county actors). Accordingly, Los Angeles County is not responsible for Judge Comparet–Cassani's actions and cannot be sued under § 1983.

■■■ Likewise, as explained above, under California law the Sheriff is acting as a state rather than county policymaker when providing security to a state courtroom. (*See supra* Part II–B–1.) As such, Los Angeles County has no responsibility for the actions of the sheriff when acting as a state policymaker. Consequently, the County cannot be liable for the incident in question because it was not done pursuant to a county policy promulgated by a county policymaker. *See Meek,* 982 F.Supp. at 1414.

Therefore, because there is no county policymaker who propounded an allegedly unconstitutional policy, the claims against Los Angeles County for damages and injunctive relief are DISMISSED.

3. *Claim for injunctive relief against Judge Comparet–Cassani*

The Court takes judicial notice of the fact that Judge Comparet–Cassani has recused herself from any remaining proceedings in Hawkins's criminal proceedings. In considering a motion to dismiss under Rule 12(b)(6) the Court may take information judicially noticed into consideration. *See Mullis v. United States Bank. Ct.,* 828 F.2d 1385, 1388 (9th Cir.1987). Taking this fact and all allegations in the complaint in the light most favorable to the non movant as true, the Court finds that there is no set of facts that can show a claim against Judge Comparet–Cassani. Accordingly, defendants' motion to dismiss claims for an injunction against Judge Comparet–Cassani is GRANTED.

4. *Claims under international law (Counts I and II)*

The plaintiff makes two claims under international law. First, the plaintiff claims that the defendants violated *jus cogens* norms of international law. Second, the plaintiff argues that the defendants violated *jus dispositivum* international law—i.e., the violation of

various treaties which the United States signed and ratified.

### a. *Violations of jus cogens international law (Count I)*

■ The plaintiff claims that the defendants' acts amount to torture under international law, and therefore the defendants violated *jus cogens* norms of international law. *Jus cogens* norms of international law comprise the body of laws that are considered so fundamental that they are binding on all nations whether the nations have consented to them or not. *See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir.1992). To determine the scope of *jus cogens* international law, courts look to several different sources including treaties, state practice, legal decisions, and works of noted jurists. *See id.* at 714–15. In this regard, several courts have found that torture is a violation of *jus cogens* norms of international law. *See, e.g., Hilao v. Estate of Marcos*, 103 F.3d 789, 795 (9th Cir.1996); *Trajano v. Marcos*, 978 F.2d 493, 500 (9th Cir.1992); *Siderman de Blake*, 965 F.2d at 714; *Filartiga v. Pena–Irala*, 630 F.2d 876, 884–85 (2d Cir.1980); *White v. Paulsen*, 997 F.Supp. 1380, 1384 (E.D.Wash.1998). These cases define torture as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

*Siderman de Blake*, 965 F.2d at 717 n. 16, *quoting* The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art 1, 39 U.N. GAOR Supp. (No. 51), 23 I.L.M. 1027 (1984).

All of the cases, however, that found a cognizable right under *jus cogens* norms of international law involved either acts committed on a foreign citizen or acts committed by a foreign government or government official. There is no reported case of a court in the United States recognizing a cause of action under *jus cogens* norms of international law for acts committed by United States government officials against a citizen of the United States. *See White v. Paulsen*, 997 F.Supp. 1380, 1383 (E.D.Wash.1998) (rejecting this type of action). Therefore, the plaintiff is inviting this Court to define a new cause of action against state officers in the United States when they act against a citizen of this country.

■ It is clear that *jus cogens* norms of international law are part of the laws of the United States. *See The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900). However, the law of nations does not in itself create a personal right of action for individual citizens. *See White*, 997 F.Supp. at 1383. Instead, "[w]hether and how the United States wished to react to such violations are domestic questions." *In Re Estate of Marcos Human Rights Lit.*, 25 F.3d 1467, 1475 (9th Cir.1994), *quoting Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 777–78 (D.C.Cir.1984) (Edwards, J., concurring).

■ It is also clear, however, that federal courts may imply a personal right of action for violations of *jus cogens* norms of international law. *See, e.g., White*, 997 F.Supp. at 1383; *see also, Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In *Bivens*, the Supreme Court held that where federally protected rights are invaded then the "courts will be alert to adjust their remedies so as to grant the necessary relief." *Bivens*, 403 U.S. at 392, 91 S.Ct. 1999. However, courts do not automatically recognize a *Bivens* claim anytime there is a federally protected right that does not have an express remedy. *See Schweiker v. Chilicky*, 487 U.S. 412, 414, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988). Instead, "federal courts also must consider whether there exist 'special factors counseling hesitation in the absence of affirmative action by Congress.'" *White*, 997 F.Supp. at 1384, *quoting Bivens*, 403 U.S. at 396, 91 S.Ct. 1999.

■ Here, as in *White*, there are several factors which counsel against the Court implying a *Bivens* right of action in this case. First, in the Court's view, there are existing remedies for plaintiff's causes of action. Indeed, the plaintiff has filed several different claims under domestic laws such as the Eighth Amendment's prohibition of cruel and unusual punishment. Moreover, many of the claims barred in this Court due to Eleventh Amendment concerns could have been brought in a California state court.

Additionally, the Court notes, as did the *White* court, that Congress has acted in the field of torture. Congress enacted the Torture Victim Protection Act of 1991. This Act creates a private right of action for victims of torture taken under color of law in a foreign nation. Pub.L. 102–256, Mar. 12, 1992, 106 Stat. 73, codified at 28 U.S.C. § 1350. Although this statute appears to be limited to acts of foreign officials, it represents congressional attempts to address the issue of a private remedy for acts of torture. Courts normally give great deference to congressional policy determinations regarding whether to afford individuals personal rights of action for particular violations. *See Schweiker*, 487 U.S. at 423, 108 S.Ct. 2460. Likewise, this Court is hesitant to create a new cause of action in a circumstance where the Legislature has stated that domestic law affords adequate remedies. *See White*, 997 F.Supp. at 1384–85.

Finally, this Court is also hesitant to interfere in an area that is traditionally entrusted to the legislative and executive branches. It is these two branches which must interpret what international obligations the United States will undertake and how to implement them domestically. *See id.* at 1385; *Handel v. Artukovic*, 601 F.Supp. 1421, 1428 (C.D.Cal.1985) (stating, "To imply a cause of action from the law of nations would completely defeat the critical right of the sovereign to determine whether and how international rights should be enforced in that municipality.").

For these reasons, the Court finds that "the special factors counseling hesitation" the *Bivens* Court discussed are present in the current case. Therefore, the Court GRANTS the defendants' motion to dismiss Count I of the plaintiff's amended complaint with prejudice.

b. *Violations of jus dispositivum international law (Count II)*

■ It is well settled that treaties are part of the supreme law of the land. U.S. Const. Art VI, cl. 2. However, it is also well settled that treaties may be modified by subsequent statutes enacted by Congress or other executive agreements. *See Moser v. United States*, 341 U.S. 41, 45, 71 S.Ct. 553, 95 L.Ed. 729 (1951). Therefore, although treaties are supreme over the laws of the several states, they are basically on par with federal law, and certainly are not superior to the Constitution.

As stated above, the Eleventh Amendment prohibits a federal court from hearing many of the plaintiff's claims. There is nothing to suggest that these international treaties grant district courts subject matter jurisdiction in cases where it would normally not exist under the Eleventh Amendment.

The plaintiff claims that the actions herein violate five "treaties" to which the United States is a signatory: the Universal Declaration of Human Rights; the Declaration on the Protection of All Persons from Being Subjected to Torture; the American Convention on Human Rights; the International Covenant on Civil and Political Rights; and the European Convention for the Protection of Human Rights and Fundamental Freedoms.[5] The plaintiff states that violations of these treaties entitle him to recover damages and to receive declaratory and injunctive relief.

■ The Supreme Court has stated that treaties are only enforceable in United States

---

5. The *amicus curiae* brief submitted by Amnesty International focuses on two international treaties: the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and the International Covenant on Civil and Political Rights. The plaintiff, however, does not cite to the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment in his amended complaint. For convenience of the parties and the Court, the Court will address all claims, including the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

courts if either the treaty is self-executing or the Legislature passes legislation implementing the provisions of a treaty. *See Foster v. Neilson,* 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829), *overruled in part on other grounds, United States v. Percheman,* 32 U.S. (7 Pet.) 51, 8 L.Ed. 604 (1833).

 The Ninth Circuit has developed a four-part test to determine when a treaty is self executing. *See Islamic Republic of Iran v. Boeing Co.,* 771 F.2d 1279, 1283 (9th Cir. 1985). The four factors a court must consider are:

(1) "the purposes of the treaty and the objectives of its creators," (2) "the existence of domestic procedures and institutions appropriate for direct implementation," (3) "the availability and feasibility of alternative enforcement methods," and (4) "the immediate and long-range social consequences of self- or non-self-execution."

*Id., quoting People of Saipan v. United States Dep't of Interior,* 502 F.2d 90, 97 (9th Cir.1974). However, in applying this test, the Ninth Circuit has found "that it is the first factor that is critical to determine *whether* an executive agreement [or treaty] is self-executing, while the other factors are most relevant to determine *the extent* to which the agreement is self-executing." *Id.* (emphasis in original).

 Therefore, the Court must examine each treaty the plaintiff cites to see if it is self-executing under the *Iran* and *Saipan* tests.

The first two "treaties" which the plaintiff cites, the Universal Declaration of Human Rights and the Declaration on the Protection of All Persons from Being Subjected to Torture, are not treaties at all. *See Siderman de Blake,* 965 F.2d at 719 (discussing Universal Declaration of Human Rights); *Filartiga v. Pena–Irala,* 630 F.2d 876, 882 (2d Cir. 1980) (discussing Declaration on the Protection of All Persons from Being Subjected to Torture). Instead, they are non-binding resolutions of the United Nations General Assembly. *See Siderman de Blake,* 965 F.2d at 719. As such, they are only intended to "represent[ ] evidence of customary international law." *Id.* They are not intended to be legally binding or create self-executing rights like other international treaties. *Id.* Therefore,

the plaintiff cannot state a claim under these resolutions.

Although the American Convention on Human Rights is a treaty to which the United States is a signatory, the United States has not yet ratified this treaty. *See Thompson v. Oklahoma,* 487 U.S. 815, 831 n. 34, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988); *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 809 (D.C.Cir.1984) (Bork, J., concurring); *Status of Inter–American Human Rights Agreements,* 36 I.L.M. 229 (1997). Therefore, this treaty is not binding on the United States. *See Tel–Oren,* 726 F.2d at 809. Consequently, the plaintiff cannot state a claim under this treaty.

Additionally, the United States is not a signatory nor has it ratified the European Convention for the Protection of Human Rights and Fundamental Freedoms. Therefore, this treaty is not binding on the United States and the plaintiff cannot state a claim under it.

The United States, however, has signed and ratified the International Covenant on Civil and Political Rights and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. Several courts have looked at these treaties and have concluded that they are not self-executing. *See Igartua De La Rosa v. United States,* 32 F.3d 8, 10 n. 1 (1st Cir.1994); *White,* 997 F.Supp. at 1385–87; *In the matter of Extradition of Cheung,* 968 F.Supp. 791, 803 n. 17 (D.Conn.1997). Furthermore, when the Senate ratified these treaties it did so "with the express proviso that they were not self-executing." *Extradition of Cheung,* 968 F.Supp. at 803 n. 17. Additionally, Congress has not enacted implementing legislation. *Id.* Therefore, these treaties do not create a private right of action under which the plaintiff can successfully state a claim.

For these reasons, the defendants' motion to dismiss Count II of plaintiff's amended complaint is GRANTED.

### 5. *Violation of the Fourth Amendment (Count IV)*

The plaintiff claims that the defendants' acts violated the plaintiff's constitutional rights under the Fourth Amendment. Although the Fourth Amendment applies to

pretrial detainees, the United States Supreme Court has stated that "[a]fter conviction, the Eighth Amendment 'serves as the primary source of substantive protection . . . in cases . . . where the deliberate use of force is challenged as excessive and unjustified.'" *Graham v. Connor*, 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), *quoting Whitley v. Albers*, 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

Here, the jury had found the plaintiff guilty of the crimes charged, but the judge had not sentenced the plaintiff. The plaintiff argues that he was a pretrial detainee until the judge sentenced him. The defendants argue that he was a post-conviction prisoner. California law defines conviction as "verdict of a jury, accepted and recorded by the court, . . . a finding of the court in a case where a jury has been waived, or . . . a plea of guilty." Cal.Penal Code § 689. California courts have interpreted this to mean that conviction is the ascertainment of guilt by the jury and not the judgment based upon the verdict of the jury. *See Tuffli v. San Diego Unified School Dist.*, 30 Cal.App.4th 1398, 36 Cal.Rptr.2d 433, 438 (Ct.App.1994). Because the jury had found Hawkins guilty before the incident in question he was a post-conviction prisoner. Therefore, the plaintiff's claim for damages under the Fourth Amendment is DISMISSED.

#### 6. *Permanent injunction (Count X)*

▮ The plaintiff requests that this Court grant declaratory and injunctive relief to a class comprised of individuals on whom the Sheriff might use the stun belt. The defendants argue that there is no possibility that the plaintiff will again be subjected to the use of this device.

Although the judge who activated the stun belt on the plaintiff has recused herself, the plaintiff complains of placement in addition to activation. (*See infra* Part III–C–1.) Likewise, the defendants admit that the Sheriff has a policy of placing stun belts on certain individuals, although the exact terms of that policy remain unclear because the defendants have not adequately addressed the Court's specific questions regarding the policy. It seems clear, though, that the Sheriff maintains a policy of placing these devices on individuals who may engage in disruptive

behavior similar to that which was allegedly engaged in by the plaintiff. Further, the plaintiff will have subsequent hearings before other judicial officers and will be in the custody of the Los Angeles County Sheriff. Given the plaintiff's history, there is a likelihood that the Sheriff or future judicial officers will perceive that the plaintiff is again engaging in the allegedly disruptive behavior. Therefore, for the purposes of a motion to dismiss the defendants have not met their burden in showing that there is not a substantial possibility of future injury sufficient to meet the standard set forth in *Lyons*, 461 U.S. at 111, 103 S.Ct. 1660.

Therefore, the defendants' motion to dismiss Count X of the plaintiff's amended complaint is DENIED.

### III. Plaintiff's Motion for Class Certification

Hawkins moves for the Court to certify a class action for the claims for injunctive relief. Hawkins claims that the class consists of (1) all individuals who are in the custody of the Los Angeles County Sheriff's Department, (2) persons who will be brought before a Los Angeles County Superior or Municipal Court, and (3) persons subjected to wearing a stun belt.

#### A. *Legal standard*

▮ The party seeking class certification bears the burden of proving that certification is appropriate. *See Doninger v. Pacific Northwest Bell, Inc.*, 564 F.2d 1304, 1308 (9th Cir.1977); *Castano v. American Tobacco Co.*, 84 F.3d 734, 740 (5th Cir.1996). In determining whether to certify a class, the Court must conduct a rigorous analysis of whether the Rule 23 prerequisites are met. *See General Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). While a determination of whether to certify a class is within the discretion of the Court, that discretion must be exercised within the parameters of Rule 23. *Castano*, 84 F.3d at 740.

▮ In considering a motion for class certification, the Court should not consider the merits of the moving party's claims. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)

("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.").

The Court may consider the allegations of the complaint in determining whether the Rule 23 requirements are met. *See* William W. Schwarzer et al., *Federal Civil Procedure Before Trial* § 10:574 (1998). In addition, the Court may consider extrinsic evidence, and may request the parties to supplement the allegations of the complaint with sufficient evidence to allow informed judgment as to each of Rule 23's requirements. *Id.* § 10:575.

### B. *The structure of Rule 23*

Hawkins has moved for certification under Rule 23(b)(2), which provides that a class action is maintainable if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R.Civ.P. 23(b)(2).

▇ In order to maintain a class action, a party must first meet the following prerequisites listed in Rule 23(a):

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

### C. *Prerequisites for class action under Rule 23(a): numerosity, commonality, typicality, and adequacy of representation*

#### 1. *Rules 23(a)(1): numerosity/impracticality of joinder*

Hawkins asserts that the class consists of the 20,000 to 22,000 detainees in the Los Angeles County jails. Hawkins asserts that this is too numerous for practicable joinder.

Defendants disagree with Hawkins's estimates of the number of people who are potentially within the class affected. They argue that during the approximately 50,000 times that prisoners have worn the stun belt across the country the belts were activated on 27 occasions, and only once in Los Angeles County. Defendants argue that such showings are insufficient to meet Rule 23's numerosity requirement.

There is a difference between these two positions. Hawkins argues for the inclusion of all people whom the Sheriff and state courts might subject to the Sheriff's policy and might be forced to wear the stun belt. Defendants argue that the class should be limited to persons on whom the belt has been activated in Los Angeles County. The Court, however, has construed the term "use" to include both placement and activation of the stun belt. (*See supra* note 1.)

Therefore, the number of people within the class would be the number of people on whom the Sheriff has placed the stun belt or on whom the Sheriff is likely to place a stun belt. The exact number of members of the class is impossible to identify, but its practical limits could include all persons in detention. This is sufficient to establish the numerosity and impracticability of joinder element. *See* 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions,* § 3.05 at 3–23–26 (3d ed.1992).

#### 2. *Rule 23(a)(2): commonality*

This prong looks at whether there are questions of law and fact common to all members of the class.

Defendants argue that the justification for using this device varies on the facts of each case. Therefore, they contend that the questions of fact and law are not common to all members of the class. Hawkins argues that placing stun belts on prisoners is a per se constitutional violation. In light of the definition of the term use, the Court is inclined to agree that the issue is whether using stun belts is a per se constitutional violation. This

issue would be common to all parties upon whom a stun belt was used. Therefore, Hawkins has satisfied the commonality requirement.

### 3. *Rule 23(a)(3): typicality*

Defendants contend that Hawkins's claims, and the defenses to which his claims are subject, are not typical of the claims of the class, as required by Rule 23(a)(3). Typicality under Rule 23(a)(3) is shown when "a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff." 1 Newberg, § 3.13, at 3–72. In making this determination, the Court should look to the elements that a plaintiff must prove to prevail on the cause of action. If the elements the class representative must prove are substantially the same as the rest of the class, typicality is generally met. *Id.* § 3.15, at 3–82. The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class. *See Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992).

If Hawkins only complained about the activation of the stun belt then he could not satisfy this requirement because he is the only person in Los Angeles County on whom a court ordered the device activated. Here, however, Hawkins argues that the violation took place when the Sheriff placed the stun belt on him. Assuming that the other potential members of the class are persons upon whom the stun belt was placed but not activated, there are no substantial differences in the alleged wrong because all members of the class would have suffered the same harm—the placement of the stun belt.

Therefore, Hawkins satisfies the typicality prong.

### 4. *Rule 23(a)(4): adequacy of representation*

The Ninth Circuit has recognized two criteria for determining the adequacy of class representation. *See Lerwill v. Inflight Motion Pictures, Inc.,* 582 F.2d 507, 512 (9th Cir.1978). First, the representative must be able to prosecute the action vigorously through qualified counsel. *See id.* Second, the representative must not have interests that are antagonistic to the interests of the class. *See id.*

As to qualifications of class counsel, the law firm of Yagman & Yagman has provided a copy of the lead counsel's resume. The standard for qualifications and competency looks to the attorney's experience, resources, ability, ethics, and any potential conflicts of interest. Although Mr. Yagman was recently suspended from the practice of law for one year, there are no arguments that the remaining firm members are not qualified to handle this litigation. Moreover, the defendants have raised no questions as to this factor, and class counsel's resume indicates the requisite ability and experience.

Second, there is no showing that Hawkins's interests would be antagonistic to other class members' interests.

### D. *Conclusion as to class certification*

Here, the plaintiff has satisfied all of the requisite elements for certification of a class. Therefore, the Court GRANTS the plaintiff's motion to certify a class. This class includes all persons who (1) are in custody of the Los Angeles County Sheriff, (2) are appearing in either a Los Angeles County municipal or superior court, (3) who engage in conduct that is perceived to be disruptive, and (4) upon whom the custodial officer may subject use of the stun belt.

### IV. Plaintiff's motion for preliminary injunction

#### A. *Legal standard*

Within the Ninth Circuit a court may issue a preliminary injunction if the moving party meets one of two alternative tests. *See International Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 822 (9th Cir.1993). In the first test the moving party must demonstrate: "(1) the moving party will suffer irreparable injury if the relief is denied; (2) the moving party will probably prevail on the merits; (3) the balance of potential harm favors the moving party; and, depending on the nature of the case, (4) the public interest favors granting relief." *Id.* Alternatively, the moving party may demonstrate either "(1) a combination of probable

success on the merits and the possibility of irreparable injury if relief is not granted; or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor." *Id.* These standards " 'are not separate tests, but the outer reaches of a single continuum.' " *Id., quoting Regents of University of Cal. v. American Broadcasting Companies,* 747 F.2d 511, 515 (9th Cir.1984).

The non moving party may immediately appeal a grant of a preliminary injunction. *See* 28 U.S.C. § 1292(a)(1). These orders are reviewed for abuse of discretion, application of an erroneous legal standard, or clearly erroneous factual errors. *See San Antonio Community Hosp. v. Southern Cal. Dist. Council of Carpenters,* 115 F.3d 685, 689 (9th Cir.1997). However, if the preliminary injunction enjoins activities of a state agency then the record must show "an intentional and pervasive pattern of misconduct." *See Thomas v. County of Los Angeles,* 978 F.2d 504, 508 (9th Cir.1992). Furthermore, the Ninth Circuit has stated that "[e]ven in the face of ongoing unconstitutional conduct on the part of state law enforcement officers, an injunction may not be issued to halt that conduct absent a great and immediate threat that the named plaintiff will suffer irreparable injury for which there would be an inadequate remedy at law." *Nava,* 121 F.3d at 458.

### B. *Discussion*

Hawkins, therefore, must show that there is a pervasive pattern of misconduct that is an intentional, concerted, and conspiratorial effort to deprive him of his constitutional rights. *See Thomas,* 978 F.2d at 508. Hawkins alleges that the Sheriff has engaged in a pattern of conduct aimed at violating constitutional rights of the named plaintiff as well as other prisoners upon whom the Sheriff has placed the stun belt. Although Hawkins cannot state a specific number of times in which the defendants have placed the stun belt on prisoners, the defendants have acknowledged that the stun belt has been used on over 50,000 occasions across the country. The defendants argue that the plaintiff points to only one incident in which one judge activated the stun belt. However, Hawkins alleges that both activation and placement of the stun belt violate the Fourth and Eighth Amendments to the Constitution.

The Supreme Court has stated that showing "relatively few instances of violations by individual[s] . . ., without any showing of a deliberate policy . . . d[oes] not provide a basis for equitable relief." *Lyons,* 461 U.S. at 104, 103 S.Ct. 1660. Here, though, Hawkins's allegations show the sort of pervasive and coordinated violations that the Ninth Circuit demands as a threshold for enjoining state law enforcement officers. Hawkins asserts, and the defendants do not deny, that the Sheriff has a policy of seeking the placement of the stun belts on prisoners in Hawkins' situation.

The defendants argue, however, that the plaintiff cannot meet his burden because he cannot demonstrate a likelihood of success on the merits. The defendants cite several cases in which circuit courts have held that use of "taser guns" by prison officials does not violate the Eighth Amendment. *See, e.g., Michenfelder v. Sumner,* 860 F.2d 328, 336 (9th Cir.1988). These cases are distinguishable from the issues here. For example, in *Michenfelder,* the Ninth Circuit focused on the use of "taser guns" to effectuate a direct order related to legitimate penal interests. *See id.* at 335. Specifically, the court noted, "the taser was used to enforce compliance with a search that had a reasonable security purpose, not as punishment. The legitimate intended result of a shooting is incapacitation of a dangerous person, not the infliction of pain." *Id.; but see, e.g., Jackson v. Bishop,* 268 F.Supp. 804, 812 (E.D.Ark.1967) (finding "Tucker Telephone," a crank telephone-like device used to deliver electric shocks to prisoners on whom it was placed to be cruel and unusual punishment); *see also Hutto v. Finney,* 437 U.S. 678, 682 n. 5, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (citing "Tucker Telephone" as "unusual").

The use of the stun belt in a courtroom is *not* analogous to the use of taser guns in prison. In prison, taser guns have been used as means of coercing compliance to an order, such as the situation where an inmate refuses to submit to a search or cease fighting. Even in these contexts the taser guns have been the subject of considerable criticism

because of unknown health risks. In a courtroom, a defendant is defending his constitutional rights. A fair and orderly judicial proceeding is one of the most important institutions of our society. Courts are frequently confronted with unruly litigants, witnesses, and attorneys. However, the judiciary has developed practices to deal with unruly participants in a manner that is designed, to the greatest extent possible, to preserve the integrity of the judicial process. The United States Supreme Court has identified three options available to courts in handling disruptive defendants refusing to obey court orders to act appropriately: (1) citing the defendant for contempt; (2) removing the defendant from the courtroom until the defendant promises to conduct himself properly; (3) permitting the defendant to remain in the courtroom but have him bound or gagged. *See Illinois v. Allen,* 397 U.S. 337, 343–44, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). Even in extreme cases, there are alternatives which allow an uncooperative defendant representing himself to participate in the trial after being ejected. For example, the court could place the defendant in another room, provide him with a video link and give him a telephone or some other means of communicating with counsel and the court. Each technique is particularized to mitigate the specific disruption before the court.

The stun belt, even if not activated, has the potential of compromising the defense. It has a chilling effect. It is inherently difficult to define in a particular judicial proceeding the boundary between permissible and impermissible conduct—the boundary between aggressive advocacy and a breach of order. An individual wearing a stun belt may not engage in permissible conduct because of the fear of being subjected to the pain of a 50,000 volt jolt of electricity. For example, a defendant may be reluctant to object or question the logic of a ruling—matters that a defendant has every right to do. A defendant's ability to participate in his own defense is one of the cornerstones of our judicial system. A pain infliction device that has the potential to compromise an individual's ability to participate in his or her own defense does not belong in a court of law.

Further, if the defendant is shocked by the stun belt, the defense is likely to be even more compromised. First, it is unreasonable to expect a defendant to meaningfully participate in the proceeding following a shock. Second, having been shocked for a particular conduct the defendant may presume that other conduct, even if appropriate, may result in other shocks.

At the very least, the plaintiff has raised serious questions going to the merits of the Fourth Amendment and Eighth Amendment claims.

Where a constitutional violation is established, usually no further showing of irreparable injury is necessary. 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, § 2944, at 94. However, if the Court determines that the plaintiff has raised only a serious question going to the merits, rather than a likelihood of success on the merits, it is appropriate to balance the hardships of the parties.

Here, the balance of hardships also tips in favor of granting a preliminary injunction. The police officers and the courts, as explained above, have a variety of options available to them to deal with disruptive defendants. Being denied use of these relatively new devices will not substantially harm them. On the other hand, individuals who will be subjected to these devices potentially face deprivation of constitutional rights. This is a serious harm.

For these reasons, the Court GRANTS the plaintiff's motion for a preliminary injunction. Therefore, the Los Angeles County Sheriff is hereby ordered not to seek a judicial order to either place or activate a stun belt on a prisoner in his custody pending the outcome of trial.

## CONCLUSION

Therefore, the Court:

1. GRANTS the defendants' motion to dismiss all claims for injunctive relief and damages with prejudice against Judge Comparet–Cassani in both her individual and official capacities;

2. GRANTS the defendants' motion to dismiss all claims for injunctive relief and damages with prejudice against the Los Angeles County Superior Court;

3. GRANTS the defendants' motion to dismiss all claims for injunctive relief and damages with prejudice against the Los Angeles County Municipal Court;

4. GRANTS the defendants' motion to dismiss all claims for damages with prejudice against the Los Angeles County Sheriff in his official capacity;

5. DENIES the defendants' motion to dismiss claims for injunctive relief against the Los Angeles County Sheriff;

6. DENIES the defendants' motion to dismiss claims for injunctive relief and damages against the Los Angeles County Sheriff in his individual capacity;

7. GRANTS the defendants' motion to dismiss all claims for damages with prejudice against Deputy Donna Jacobs in both her official and individual capacities;

8. GRANTS the defendants' motion to dismiss all claims for injunctive relief and damages with prejudice against Los Angeles County;

9. GRANTS the defendants' motion to dismiss all claims under Counts I (violations of *jus cogens* international law) and II (violations of *jus dispositivum* international law) of the plaintiff's amended complaint;

10. GRANTS the defendants' motion to dismiss claims for damages under the Fourth Amendment in Count IV of the plaintiff's amended complaint;

11. DENIES the defendants' motion to dismiss Count X of the plaintiff's amended complaint;

12. GRANTS plaintiff's motion for class certification; and

13. GRANTS plaintiff's motion for preliminary injunction.

IT IS SO ORDERED. ·