[No. B104513. Second Dist., Div. Six. Aug. 5, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY CRYDER GARCIA, Defendant and Appellant.

1352

**COUNSEL**

Marcia C. Levine, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Susan D. Martynec and James William Bilderback II, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**YEGAN, J.**—Anthony Cryder Garcia, a defendant subject to the "Three Strikes" law, was convicted by a jury of, inter alia, the first degree murder of

Darryl Jurczeski. (Pen. Code, §§ 187, 189.) He was sentenced to state prison for a term of 59 years to life. He appeals contending the trial court abused its discretion when it ordered him to wear a belt capable of delivering a powerful electric shock if he became violent, attempted to escape or otherwise misbehaved during trial. He further contends the testimony of a "prosecution witness" ought to have been excluded because it resulted from a coercive plea agreement. We affirm.

## FACTS

Guy Morillo drove Billy Reese, appellant and Darryl Jurczeski from Paso Robles to a turnout on Highway 46 near Cambria. He stopped the car there, so the four men could relieve themselves. Morillo and Reese testified that when Jurczeski walked up a small embankment toward the car, appellant shot Jurczeski with a pistol. Jurczeski said, "why me?" and started to fall down the embankment. Appellant followed, shooting Jurczeski twice more. When appellant returned to the car, Morillo took the gun from him and emptied it. Reese picked up some spent shells. The three men returned to Paso Robles where they separated.

Appellant and Jurczeski worked together selling methamphetamine. Before the murder, appellant told Jurczeski's girlfriend that Jurczeski would have to be "taken out" because he was a "snitch," i.e., a police informant. On the day of the murder, appellant made similar comments to another acquaintance, Steve Routh.

The murder weapon was never recovered. However, the parties stipulated that it was originally owned by Kathy Robinson. Robinson asked Guy Morillo to sell the gun for her. Morillo gave it to Steve Routh, who agreed to sell it. Routh gave the gun to appellant, in trade for another handgun.

A few days after the murder, appellant took the pistol to his longtime friend, Victor Arismendez. He told Arismendez that he had done something he regretted and needed to get rid of the gun. When Arismendez asked whether appellant was referring to the Jurczeski murder, appellant said he was. Roy Pelton was doing some work at Arismendez's house that day. Arismendez offered to sell the gun to Pelton, then checked with appellant before quoting a purchase price of $100. Pelton bought the gun. No one told him it had been used in a murder. Within a day or two, Arismendez told Pelton the gun might have been used in a murder and told him to get rid of it. Pelton complied by throwing the gun into a dumpster.

Appellant presented no affirmative evidence in his defense. Instead, he impeached most of the prosecution witnesses with their prior felony convictions, lengthy histories of drug abuse, and prior inconsistent statements to

the police. For example, Morillo, Reese, Routh and several other witnesses denied any knowledge of the murder during their initial interviews with law enforcement.

Appellant's theory was that Morillo was the killer. Under this theory, Morillo accused appellant to deflect suspicion from himself, Reese implicated appellant to obtain the favorable disposition of a burglary charge that was later dismissed, and Arismendez did so pursuant to a plea agreement. Under the plea agreement, Arismendez agreed to testify and was allowed to plead no contest to six felony charges. Probation was to be granted with Arismendez serving a one-year term in county jail. The agreement also provided that a felony charge pending against Arismendez's girlfriend would be reduced to a misdemeanor.

### Trial Court Proceedings and the Order for the "React" Belt

Times have changed and so has technology. We have apparently progressed from the "ball and chain" to an electronic belt which is functionally invisible and accomplishes the same goal as physical shackling. During trial, appellant was required to wear a "React" belt underneath his clothing. The belt will deliver 50,000 volts of electricity if activated by a remote transmitter that is controlled by an attending officer. This shock will immobilize the wearer and may create a "[p]ossibility of self-defecation" and a "[p]ossibility of self-urination[.]" A prisoner notification form states the belt could be activated if the wearer fails to "COMPLY WITH OFFICER DIRECTION," or engages in: "A. Any outburst or quick movement [¶] B. Any hostile movement [¶] C. Any tampering with the belt [¶] D. Failure to comply with verbal command for movement of your person. [¶] E. Any attempt to escape custody [¶] F. Any loss of vision of your hands by the custodial officer. [¶] G. Any overt act against any person within a fifty (50) foot vicinity."

When appellant's counsel objected to the use of the belt, the prosecutor and courtroom bailiff explained it was necessary because appellant was charged with murder, this was a third strike case, and his criminal history included two felony convictions for robbery. While the record is undeveloped as to the factual underpinnings, the Sheriff of San Luis Obispo County requested that appellant wear the belt at his jury trial.

The trial court found the belt was not a physical restraint within the meaning of *People* v. *Duran* (1976) 16 Cal.3d 282, 291 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1], because it did not confine appellant's movement. It distinguished the belt from physical restraints because the belt could not be seen and would not require appellant to "shuffle past the jury in

chains." The trial court ordered appellant to wear it for the reasons articulated and because the belt was a "minimal restraint" that "is absolutely not visible" and that caused "no prejudice to the defendant at all . . . ."

### Traditional Rules for Physical Restraint During Jury Trial

■ "[A] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran, supra,* 16 Cal.3d at pp. 290-291, fn. omitted.) Manifest need exists "only upon a showing of unruliness, an announced intention to escape, or '[e]vidence of any nonconforming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained . . . .' " (*People v. Cox* (1991) 53 Cal.3d 618, 651 [280 Cal.Rptr. 692, 809 P.2d 351], quoting *Duran, supra,* 16 Cal.3d at p. 292, fn. 11.) Although the trial court's discretion to order shackles is relatively narrow, appellate courts will uphold its order absent a clear showing of abuse. (*People v. Pride* (1992) 3 Cal.4th 195, 231 [10 Cal.Rptr.2d 636, 833 P.2d 643]; *People v. Cox, supra,* 53 Cal.3d at p. 651.)

A defendant's "record of violence, or the fact that he is a capital defendant, cannot alone justify his shackling." (*People v. Hawkins* (1995) 10 Cal.4th 920, 944 [42 Cal.Rptr.2d 636, 897 P.2d 574].) Instead, "the Courts of Appeal have generally read *Duran* as requiring that a defendant make specific threats of violence or escape from court or demonstrate unruly conduct in court before in-court restraints are justified." (*People v. Valenzuela* (1984) 151 Cal.App.3d 180, 192 [198 Cal.Rptr. 469].) Violence while in custody or a recent history of escape also justifies the use of restraints. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1215 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *People v. Sheldon* (1989) 48 Cal.3d 935, 945-946 [258 Cal.Rptr. 242, 771 P.2d 1330].)[1]

Physical restraints during trial are discouraged for several reasons. Most important is the inherent risk that "the shackling of a criminal defendant will [cause] prejudice . . . in the minds of the jurors. When a defendant is charged with any crime, and particularly if he is accused of a violent crime, his appearance before the jury in shackles is likely to lead the jurors to infer that he is a violent person disposed to commit crimes of the type alleged." (*People v. Duran, supra,* 16 Cal.3d at p. 290; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 583-584 [15 Cal.Rptr.2d 382, 842 P.2d 1142].)

---

[1] We assume, without deciding, that the record was not sufficiently developed so as to permit an order for physical restraint under a strict reading of *People v. Duran, supra,* 16 Cal.3d 282. As we shall explain, however, a showing under *Duran* and the case law interpreting it was not required.

Shackling is also discouraged because it may impair a defendant's ability to participate in his or her defense. The "affront to human dignity" caused by shackles may impair the defendant's mental faculties by confusing or embarrassing him, or by inflicting pain. Shackles may also prevent effective communication with counsel and discourage a defendant from testifying. (*People* v. *Duran, supra,* 16 Cal.3d at pp. 290-291; *People* v. *Fierro* (1991) 1 Cal.4th 173, 219-220 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *Spain* v. *Rushen* (9th Cir. 1989) 883 F.2d 712, 720-721.) Finally, ". . . physical restraints should be used as a last resort . . . because 'the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.' (*Illinois* v. *Allen* [(1970)] 397 U.S. 337, 344 [90 S.Ct. 1057, 1061, 25 L.Ed.2d 353, 359].)" (*People* v. *Duran, supra,* 16 Cal.3d at p. 290.)

Thus, the case law dealing with physical restraints at a jury trial is well settled. The underpinnings for these rules remain valid. ■ The rules, however, have no application to the instant case. Since the reasons for the rules have largely ceased, the physical restraint rules should cease to have application here. (Civ. Code, § 3510 ["When the reason of a rule ceases, so should the rule itself."].)

The cases limiting use of physical restraints uniformly are concerned with traditional devices such as handcuffs, leg irons, waist chains and gags. These differ significantly from the belt at issue here because, as the trial court found, the belt does not restrain physical movement and cannot be seen by jurors. Thus jurors who cannot see the belt cannot use it as a basis for drawing inferences about the wearer's guilt or propensity for violence. The belt does not diminish courtroom decorum, is less likely to discourage the wearer from testifying, and should not cause confusion, embarrassment or humiliation.

*Psychological Restraint*

■ For the first time on appeal appellant contends the belt qualifies as a restraint because the threat that sudden movement will cause a debilitating electric shock may cause "psychological" restraint which may prevent wearers from communicating with their counsel. At no time below did appellant object or argue that wearing this belt would be a "psychological" restraint and/or impair the attorney-client communication process. Consequently, the record is not developed with respect to theoretical "psychological" restraint. Appellant is precluded from switching theories on appeal. (*People* v. *Badgett* (1995) 10 Cal.4th 330, 351 [41 Cal.Rptr.2d 635, 895 P.2d 877]; *People* v. *Borland* (1996) 50 Cal.App.4th 124, 129 [57 Cal.Rptr.2d 562].) The assumption that shocks will be administered whenever an otherwise compliant

defendant tries to communicate with counsel is unwarranted. The notification form (*ante,* at p. 1354) does not in any way preclude appellant from conversing with his attorney and the trial court expressly told him that ". . . he can move about the courtroom and move his hands and legs."

Moreover, appellant does not argue, and there is no showing, that his mental faculties were impaired, that he was confused, or that his ability to communicate with counsel was impeded during this trial because he was wearing the electronic belt. ■ Error is never presumed and all intendments are in favor of the judgment on appeal. (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 100 [279 Cal.Rptr. 276, 806 P.2d 1311]; *People* v. *Davis* (1996) 50 Cal.App.4th 168, 172 [57 Cal.Rptr.2d 659]; *People* v. *Superior Court* (*Ramos*) (1991) 235 Cal.App.3d 1261, 1266, fn. 2 [1 Cal.Rptr.2d 333].) ■ Appellant's conviction may not be reversed based solely upon his speculation that wearing the belt may have impaired his communicating with counsel. (*People* v. *Pride, supra,* 3 Cal.4th 195, 233-234.)

### Standard for the Use of Electronic Restraint

■ Our holding does not mean that electronic belt devices may be employed at the simple request of the sheriff or prosecutor even if they will prevent violence, disruption of the court, or escape in 100 percent of the cases. There must be a showing of good cause based upon a totality of the facts and circumstances. The decision whether to require "belting" is addressed to the trial court's sound discretion.

■ Based upon the totality of facts and circumstances, there was a showing of good cause and the trial court did not abuse its discretion in ordering appellant to wear the "React" belt. Appellant was charged with and a magistrate ruled that there was probable cause to believe he committed the murder with the use of a firearm. Appellant was subject to the Three Strikes law and faced imprisonment for the remainder of his life. His priors were crimes of violence. The people testifying against him were friends or associates who "turned" on appellant. This, of course, was reminiscent of the scenario which caused the demise of the victim, Jurczeski.[2]

As the saying goes, an ounce of prevention is worth a pound of cure. Had the trial court denied the request for "belting" and had appellant become violent during the trial, justifiable criticism of the trial court's ruling would have been appropriate. The trial court was in the best position to view the

---

[2]This last factor, in and of itself, may be a sufficient basis for the trial court's order. It may have been one of the factors that prompted the sheriff to request that appellant wear the electronic belt.

potential tension between appellant and his former friends and associates who were testifying against him. To say there was a potential for violence and disruption of courtroom proceedings would be an understatement. That this did not come to pass does not impeach the trial court's order. Instead, it may show that the use of the electronic belt prevented violence and the disruption of cc ·rtroom proceedings.

### Coercive Plea Agreement

Victor Arismendez testified, pursuant to a plea agreement. According to the prosecutor, the agreement provided that, "if Mr. Arismendez testifies honestly and truthfully throughout the stages of . . . People versus Garcia, in the present case he is facing, he would enter a plea of no contest to all the counts, admit the enhancement and receive a stipulated sentence [of] one year in the county jail. [¶] That would also run concurrently with any sentence he receives in [another] pending felony case . . . ." In addition, the prosecutor agreed that "charges against [Arismendez's] girlfriend would be a misdemeanor charge and probation without any custody time." Arismendez testified about his acquisition of the murder weapon during the change of plea proceedings, in order "to lay the foundation for his testimony at . . . [appellant's] trial and also to record and memorialize the [plea] agreement that we have." His testimony at appellant's trial was generally consistent with the testimony he gave at the hearing.

 Appellant contends Arismendez's sworn, preplea testimony renders the plea agreement coercive in violation of the rule announced in *People* v. *Medina* (1974) 41 Cal.App.3d 438 [116 Cal.Rptr. 133] (hereafter, *Medina*). There, the court held, ". . . a defendant is denied a fair trial if the prosecution's case depends substantially upon accomplice testimony and the accomplice witness is placed, either by the prosecution or the court, under a strong compulsion to testify in a particular fashion." (*Id.* at p. 455.) Under this rule, testimony is inadmissible if the witness has been granted immunity or given a plea agreement subject to the condition that his testimony conform to an earlier statement or produce a conviction. (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1251-1252 [232 Cal.Rptr. 849, 729 P.2d 115].) "On the other hand, although there is a certain degree of compulsion inherent in any plea agreement or grant of immunity, it is clear that an agreement requiring only that the witness testify fully and truthfully is valid." (*Ibid.*, see also *People* v. *Pinholster* (1992) 1 Cal.4th 865, 938-939 [4 Cal.Rptr.2d 765, 824 P.2d 571]; *People* v. *Garrison* (1989) 47 Cal.3d 746, 768-769 [254 Cal.Rptr. 257, 765 P.2d 419].)

The agreement at issue here does not violate the *Medina* rule because Arismendez was not an accomplice upon whose testimony the prosecution

substantially based its case. He was required only to testify fully and truthfully at appellant's trial. There was no requirement that his testimony conform to the testimony he gave at his plea hearing. ■■■ "It is a rare case indeed in which the prosecutor does not discuss the witness's testimony with him beforehand and is assured that it is the truth. However, unless the bargain is expressly contingent on the witness sticking to a particular version, the principles of *Medina* . . . are not violated." (*People* v. *Garrison*, *supra*, 47 Cal.3d at p. 771.) ■■■ Accordingly, the trial court did not err in permitting Arismendez to testify.

CONCLUSION

The judgment is affirmed.

Stone (S. J.), P. J., and Gilbert, J., concurred.