92 Cal.Rptr.2d 771 (2000)
77 Cal.App.4th 1284
The PEOPLE, Plaintiff and Respondent,
v.
James Allen MAR, Defendant and Appellant.
No. F028945.
Court of Appeal, Fifth District.
February 1, 2000.
As Modified on Denial of Rehearing February 22, 2000.
Review Granted June 2, 2000.
*773 Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.
Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Clayton S. Tanaka and Garrick W. Chock, Deputy Attorneys General, for Plaintiff and Respondent.
Certified for Partial Publication.[*]

*772 OPINION
BUCKLEY, J.
Defendant James Allen Mar was convicted after jury trial of violating Penal Code sections 69 and 148.10, subdivision (a) (interfering with and resisting a peace officer); the court found allegations that defendant had suffered two prior serious felony convictions within the meaning of the three strikes law and had served a prior prison term to be true.[1] He was sentenced to 26 years' imprisonment.
Defendant challenges his most recent convictions on numerous grounds. In the published portion of this opinion, we address defendant's contention that the trial court infringed on his constitutional protection against self-incrimination by refusing to remove the electronic stun belt he wore during trial while he testified. Having concluded that the record discloses the existence of a manifest need for restraint and that defendant did not show that the security risks which necessitated belting were reduced or eliminated while he testified, we find no error. In the unpublished portion of this opinion, we address defendant's claims of instructional error. As prejudicial error has not been shown, we will affirm.

FACTS

A. Prosecution evidence.
At approximately 3:00 p.m. in the afternoon of September 2, 1996, Kern County Sheriff Deputy Raymond Mellon was dispatched to a residential street in Taft to investigate a report of a disoriented male. He found defendant sitting on a curb, crying. Defendant told Deputy Mellon he could not recall his name, although he believed his first name might be "Jim." A consensual search disclosed no identification on defendant's person or belongings. After further conversation, Deputy Mellon asked defendant to accompany him to the Taft Police Department for a fingerprint check to determine his identity. Defendant agreed.
Deputy Mellon transported defendant, unrestrained, to the Taft police station. At the booking counter defendant recalled his last name and other bits of information. The police dispatcher performed a warrant check for "James Mar" and found an outstanding "want" by a parole agent. Shortly thereafter, Parole Agent David Soares telephoned Deputy Mellon and told him to place a parole hold on defendant (§ 3056). Deputy Mellon then asked defendant to go inside the booking holding cage and sit *774 down on the bench. After defendant complied, Deputy Mellon closed the wire mesh door of the cage and informed defendant he was under arrest for a parole violation.
Defendant's demeanor abruptly changed. He began pacing the floor and yelling and pounding on the cage's cement walls and the wire mesh door with his closed fists. He aggressively threatened to "kick [Deputy Mellon's] ass" and challenged him to open the door so they could fight. Taft Police Sergeant Matthew Holm heard the disturbance and went to the booking area with another officer. Defendant threatened to "kick everybody's ass" and continued pounding on the walls and pacing.
Normally, after booking is completed, inmates are removed from the holding cage and placed in a jail cell. However, because of defendant's agitated state, Sergeant Holm and Deputy Mellon decided to move defendant from the holding cage into a specially padded "detox" cell.[2] They were concerned defendant might harm himself if he were left in the cage or placed in a regular cell. They also hoped that because individuals inside the detox cell cannot see any jail officers, defendant might calm down once he was moved.
Sergeant Holm walked to the cage door, told defendant he was going to be moved and asked for his cooperation. In response, defendant assumed a crouched "fight ready stance" and told Holm to "come on in" so he could "kick his ass." Sergeant Holm opened the cage door and defendant rushed head first into his chest, knocking him backwards. As he stumbled, Sergeant Holm hit defendant's head twice with his right fist, fracturing one of his fingers and damaging a ligament in this hand. Deputy Mellon and another officer helped subdue defendant. He was handcuffed and removed to the detox cell without further incident.
Deputy Mellon did not see any indications from defendant's appearance that he was under the influence of any drug; the deputy did not believe he was mentally ill or withdrawing from a drug addiction. Defendant did not ask Deputy Mellon for the use of a telephone. Sergeant Holm did not recall whether defendant asked if he could make a telephone call.

B. The defense.
Defendant testified on his own behalf. He lived in Santa Barbara County but had traveled to Taft a few days before his arrest without notifying his parole officer. He had gone on a methamphetamine binge and had not slept for two days, missing a scheduled meeting with his parole officer for a drug test. He had run out of money and his car was inoperable. He felt depressed, scared and anxious because he had violated the terms of his parole by changing his address and using methamphetamine. He decided to return to custody before he was charged with new criminal law violations. He planned to turn himself into the police, call his parole officer and tell the officer he had surrendered so he could obtain leniency for his parole violations. In furtherance of this plan, defendant asked someone to call 911 so he could go to jail. After the call was made, he sat waiting on the curb until Deputy Mellon arrived. When the deputy arrived, defendant pretended he did not recall his name and made up other things to induce Deputy Mellon to take him into custody. When the deputy asked defendant if he minded going to the police station, he readily agreed.
*775 Once they were at the station, defendant told Deputy Mellon his full name, place of birth, address, driver's license number and the name of his parole agent. He told Mellon he was a parolee and it was important he be allowed to telephone his parole officer and personally report his parole violations. After the booking process was completed, defendant sat in the holding cage and waited for approximately 15 to 20 minutes before again requesting to use the telephone. Mellon did not answer. During the next 10 minutes, defendant asked Mellon four or five more times to use the telephone. He "didn't really get a response" from the officer. Defendant then saw Mellon begin to dial the telephone. He believed Mellon was telephoning defendant's parole officer. Hearing Mellon say, "I have one of your parolees in custody," defendant became enraged and started shouting obscenities and banging on the cage.
When Sergeant Holm appeared, defendant loudly demanded to use the telephone, telling him Deputy Mellon had refused his request. Sergeant Holm told him to sit down. He continued pacing and demanding his "fucking' phone call." He admitted challenging the officers to come and fight him. Defendant saw the officers talking and thought they were going to enter the holding cell to beat him up. He adopted a "stance" and held his hands up. However, when the cage door opened he went forward straight to the floor in self-protection. Sergeant Holm fell on top of him and someone hit him several times on the back of his head. Defendant did not recall lunging into Sergeant Holm's chest.
Later in his testimony defendant admitted he knew the officers were entering the holding cage to move him to another cell. He "wasn't going to cooperate [with them]. No." He knew he was "going to end up fighting with [the officers], yes." He fell on the ground to try to keep the officers from moving him, explaining "I wanted to make a phone call. I didn't want to be removed from, from where I was at.... I wanted to make a point that I wanted my call, ..."

DISCUSSION

I. Refusal to remove a stun belt while defendant testified did not violate defendant's constitutional protection against self-incrimination.
During the second day of trial, May 7, 1997, an electronic stun belt was placed around defendant's waist underneath his clothing. Stun belts are used to guard against escape and to ensure courtroom safety. This device, manufactured by Stun-Tech, is known as the Remote Electronically Activated Control Technology (REACT) belt. The type of stun belt which is used while a prisoner is in the courtroom consists of a four-inch wide elastic band which is worn underneath the prisoner's clothing. This band wraps around the prisoner's waist and is secured by a velcro fastener. The belt is powered by two nine-volt batteries connected to prongs which are attached to the wearer over the left kidney region. Another version of the REACT belt is mainly used when transporting prisoners. It is a clearly visible belt which fastens around the waist of the prisoner over his or her clothes and has steel handcuff rings attached in the front. (Comment, The REACT Security Belt: Stunning Prisoners and Human Rights Groups into Questioning Whether Its Use is Permissible Under the United States and Texas Constitutions (1998) 30 St. Mary's L.J. 239, 242-243, 246-247 (hereafter REACT Security Belt); People v. Garcia (1997) 56 Cal. *776 App.4th 1349, 1354, 1358, 66 Cal.Rptr.2d 350 (hereafter Garcia).)
The stun belt will deliver an eight-second, 50,000-volt electric shock if activated by a remote transmitter which is controlled by an attending officer. The shock contains enough amperage to immobilize a person temporarily and cause muscular weakness for approximately 30 to 45 minutes. The wearer is generally knocked to the ground by the shock and shakes uncontrollably. Activation may also cause immediate and uncontrolled defecation and urination, and the belt's metal prongs may leave welts on the wearer's skin requiring as long as six months to heal. An electrical jolt of this magnitude causes temporary debilitating pain and may cause some wearers to suffer heartbeat irregularities or seizures. (Garcia, supra, 56 Cal. App.4th at p. 1354, 66 Cal.Rptr.2d 350; People v. Melanson (Colo.App.1996) 937 P.2d 826, 835; REACT Security Belt, supra, 30 St. Mary's L.J. at pp. 247-252; Brienza, Stun Belts Zapped by Civil Liberties Groups (1999) 35-APR Trial 99, 99 (hereafter Brienza).)
The decision to belt defendant was precipitated by pretrial incidents in which defendant became loud and combative towards detention officers, as well as consideration of the nature of the current offense and defendant's prior criminal history, which includes convictions for assault with a deadly weapon on a peace officer and nonviolent escape. On February 14, 1997, while defendant was in custody at the Lerdo pretrial facility, defendant became angered with a correctional officer and threatened to "`bust him in the mouth.'" Another incident occurred on March 19, 1997. On this occasion, defendant began yelling, kicking at walls, stomping the floor and challenging a female deputy to come into his cell and fight with him. Defendant also verbally assaulted his own defense attorney during this incident.
Out of the presence of the jury, defendant, through his attorney, asked that the stun belt be removed while he was testifying. Counsel explained, "If the Court wants him to wear it before he gets on the stand to testify or after he testifies, he's agreeable to do that, but he's asking that it not be on so it won't impede his testimony." She stated that defendant objected to wearing the belt because it was making him nervous and agitated. He was afraid of accidental activation. Defendant was concerned that he would not be able to think clearly and testify properly while wearing the belt. Furthermore, defendant found it uncomfortable to sit while wearing the belt because it prevented him from leaning all the way back in his chair.
The court initially deferred ruling on the matter, although it did note that it was concerned because "from time to time [defendant] does appear to reflect strong emotions." Later in the morning, it denied defendant's request to remove the belt while he testified. Thereafter, defendant testified without incident as set forth, ante.
Objection to the use of stun belts on prisoners has been raised in various forums on the ground that the device constitutes cruel and unusual punishment in violation of the Eighth Amendment to the federal Constitution, that it interferes with the wearer's Sixth Amendment right to the assistance of counsel and that it impinges upon the presumption of innocence and therefore violates the Fourteenth Amendment's due process protection. (See, e.g., REACT Security Belt, supra, 30 St. Mary's L.J. 239; Schultz, Terror, Torment, and Tyranny: The State of Human Rights Today (1998) 12 Emory Internat. L.Rev. 1255; Brienza, supra, 35-APR Trial 99; Burley, History Repeats Itself in the Resurrection of Prisoner Chain Gangs: Alabama's Experience Raises Eighth Amendment Concerns *777 (1997) 15 Law & Ineq. J.: A Journal of Theory & Practice 127.) However, defendant does not advance such arguments here. Rather, he contends that the trial court's refusal to remove the belt while he was testifying violated his Fifth Amendment protection against self-incrimination because he was unable to testify unimpeded by fear of electric shock.[3] Relying on Garcia, supra, 56 Cal.App.4th 1349, 66 Cal.Rptr.2d 350, respondent argues that the traditional rules for physical restraint during jury trial do not apply and the decision to require belting met the applicable "good cause" standard, (la) As shall be explained, we find Garcia to be poorly reasoned; in our judgment the stun belt is a physical restraint and the traditional rules governing use of restraints apply. (2a) However, the record here amply justifies the decision to belt defendant. As he did not set forth any persuasive justification for the removal of the belt while he testified, we do not find error.
In People v. Duron (1976) 16 Cal.3d 282, 127 Cal.Rptr. 618, 545 P.2d 1322 (hereafter Duran), our high court addressed the use of physical restraints in the courtroom, holding that because of the "possible prejudice in the minds of the jurors, the affront to human dignity, the disrespect for the entire judicial system which is incident to unjustifiable use of physical restraints, as well as the effect such restraints have upon a defendant's decision to take the stand, ... a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (Id. at pp. 290-291, 127 Cal.Rptr. 618, 545 P.2d 1322.) Duran's holding was not limited to visible restraints. Rather, the high court "simply note[d] that less drastic and less visible restraints" than shackles or manacles "should be employed when, in the exercise of his discretion, the judge concludes it is safe to do so." (Id. at p. 291, fn. 9, 127 Cal.Rptr. 618, 545 P.2d 1322.) The court even specified in Duran that when visible restraints are used the jury must be instructed sua sponte to disregard the restraints in reaching its verdict. When the restraints are concealed, such an instruction is not to be given absent request from the defendant. (Id. at pp. 291-292, 127 Cal.Rptr. 618, 545 P.2d 1322.)
In Garcia, supra, 56 Cal.App.4th 1349, 66 Cal.Rptr.2d 350, the Second District Court of Appeal upheld the trial court's order that defendant be belted during trial. Central to the opinion was the appellate court's conclusion that a stun belt was not a physical restraint within the meaning of Duran. This finding was based on the facts that the belt is not seen by the jurors, does not restrain physical movement, "does not diminish courtroom decorum, is less likely to discourage the wearer from testifying, and should not cause confusion, embarrassment or humiliation." (Id. at p. 1356, 66 Cal.Rptr.2d 350.) However, in reaching this conclusion, the appellate court explicitly refused to consider whether the belt caused a psychological restraint stemming from the fear that sudden movement would cause a debilitating electric shock as it determined this assumption was unwarranted. (Id. at pp. 1356, 1357, 66 Cal.Rptr.2d 350.) Moreover, it ignored all of Duran's references to nonvisible restraints. The opinion focuses almost exclusively on the fact that *778 the stun belt is not visible. These omissions undercut the validity of Garcia's holding; we find the opinion to be less than persuasive and will therefore assess the issue independently.
Defendant's argument below focused on the anxiety and distraction occasioned by fear of accidental activation. The trial court summarily dismissed this possibility. We are not so sure. There appears to be an alarmingly high error rate associated with stun belts. While this court does not offer any opinion regarding the legal conclusions reached in REACT Security Belt, the article includes the following disturbing factual assertion, which it supports by citation to several seemingly reliable sources: "During the few years that the REACT belt has been in use in courtrooms, it has been activated a total of twenty-one times, only twelve times intentionally." (REACT Security Belt, supra, 30 St. Mary's L.J. at p. 289.) This constitutes an approximately 43 percent error rate. (Ibid.) REACT Security Belt also references a comment by Stun-Tech's president "that belts were used to shock inmates intentionally ten times and accidentally eight times," and another remark that "unintentional activations match intentional ones." (Id. at p. 304, fn. 274.) An accidental activation rate of close to 50 percent cannot be dismissed cavalierly.
At least two instances of accidental activation have been documented. In State v. Filiaggi (Ohio 1999) 86 Ohio St.3d 230, 714 N.E.2d 867, the Ohio Supreme Court upheld defendant's murder conviction despite the fact he had been accidentally shocked by a stun belt. And the accidental activation of the stun belt worn by the accused during a death penalty murder trial in Dallas, Texas, received wide news coverage. (REACT Security Belt, supra, 30 St. Mary's L.J. at pp. 296-297.)
We are not the first court to give credence to the risk of accidental activation and consequent psychological effects on the wearer. In People v. Melanson, supra, 937 P.2d 826, Division IV of the Colorado Court of Appeals found defendant's fear of accidental activation to be a relevant factor in determining whether use of this security measure was appropriate. And in U.S. v. Simmonds (D.Colo.1998) 179 F.R.D. 308, the court addressed defendant's argument that his consent to proceed before a magistrate had been coerced, in part because he was afraid of the stun belt he had been forced to wear during proceedings. (Id. at p. 312, fn. 2.)
We are also cognizant of the fact that a stun belt, if activated, may cause the wearer to suffer serious, painful and humiliating injury which could be permanent in nature. (REACT Security Belt, supra, 30 St. Mary's L.J. at p. 276.) Shackles and handcuffs, while visible, do not present a risk of substantial physical harm. The stun belt does. In addition to shaking, pain, burns and uncontrolled defecation/urination, application of 50,000 volts of electricity could cause a wearer to suffer heartbeat irregularities and seizures. In at least one instance, application of such a shock killed its recipient. (Id. at pp. 251-252, 276.)
Given these factors, we find defendant's fear of the stun belt to be reasonable. Even the belt's manufacturer advertises that the device will provide the controlling officers with "`total psychological supremacy'" over its wearer. (REACT Security Belt, supra, 30 St. Mary's L.J. at p. 252.) The wearer of a stun belt is necessarily exposed to a substantial risk that the device will be accidentally activated, triggering at the minimum a profoundly humiliating episode of pain and shaking and possibly causing more serious injury.[4] The fact that the belt was not readily observable is not determinative; Duran, supra, 16 Cal.3d 282, *779 127 Cal.Rptr. 618, 545 P.2d 1322 does not exempt nonvisible security devices from its holding that a manifest need for restraint must be shown. (At pp. 290-291, 127 Cal.Rptr. 618, 545 P.2d 1322.) Accordingly, we hold that a stun belt is a physical restraint within the meaning of Duran and therefore, the traditional standard applies.
Yet, even under Duran's more restrictive "manifest need" standard, the record contains ample justification for belting defendant during his testimony. He was on trial for assaulting a guard; he had previously been convicted of escape and of assaulting a peace officer; on two recent occasions he had threatened correctional officers and threatened his own defense attorney. Defendant was certainly a security risk who placed courtroom personnel in peril.
Moreover, defendant did not object to the belting per se and did not request that an alternative form of restraint be used. He only objected to being belted while he testified. However, defendant did not explain why he presented any less a security risk while he testified than at other times during the trial and no justification for relaxing security during this period appears from the record.
Finally, there is no indication from defendant's testimony that his mental faculties were impaired during his testimony, that he was confused, or the belting impacted his ability to communicate with counsel. The fact that defendant did not disrupt the courtroom proceedings does not impeach the court's decision. Rather, it may simply indicate that the belting served its intended purpose.
We hold that the trial court acted well within its discretion in denying defendant's request to remove the stun belt while he testified. (People v. Melanson, supra, 937 P.2d at pp. 835-836; cf. U.S. v. Brooks (7th Cir.1997) 125 F.3d 484, 502.)[5]

II. No prejudicial instructional error occurred.[**]

III. Denial of defense counsel's motion to withdraw was not an abuse of discretion.
On July 3, 1997, defense counsel moved to withdraw on the ground that there existed a conflict of interest between her and defendant resulting from his filing of a petition for writ of habeas corpus in an appellate court based on ineffective assistance of counsel at trial.[9] At the hearing on the motion, defense counsel informed the court that defendant refused to communicate with her because he believed she should have presented further witnesses and a psychiatrist at trial. Counsel stated *780 that she would continue to represent the defendant "if the Court wants me to." Thereafter, the court denied the motion on the grounds that defendant's refusal to work with his attorney did not justify removal and counsel was still able to litigate sentencing issues and issues relative to a new trial motion. It also granted defense counsel a two-week continuance of sentencing so she could file a motion to strike one or more of the priors.
On appeal, defendant argues that his act of filing a habeas petition on the ground that counsel was ineffective at trial created an actual or potential conflict of interest mandating appointment of alternative counsel.[10] Unfortunately for defendant, in People v. Horton (1995) 11 Cal.4th 1068, 47 Cal.Rptr.2d 516, 906 P.2d 478, our Supreme Court has declared otherwise. There, the high court rejected defendant's claim that "the trial court erred in refusing to permit appointed counsel to withdraw as counsel for defendant on the asserted ground the filing of [a] malpractice action [against counsel] created a conflict of interest between defendant and appointed counsel." (Id. at p. 1104, 47 Cal.Rptr.2d 516, 906 P.2d 478.) The court gave two reasons. First, defendant's claim of a conflict of interest was undermined because he had voluntarily dismissed the malpractice complaint. Second, the trial court's finding that the suit was frivolous and filed for the purpose of interfering with the criminal prosecution was supported by the record. (Id. at pp. 1106-1107, 47 Cal. Rptr.2d 516, 906 P.2d 478.)[11] In its discussion of the latter point, the high court stated that while being named as a defendant in a collateral lawsuit may place the attorney in a situation in which his or her loyalties are divided, a criminal defendant's decision to file such an action does not require disqualification unless the circumstances demonstrate an actual conflict of interest. (Id. at p. 1106, 47 Cal.Rptr.2d 516, 906 P.2d 478.) "A contrary holding would enable an indigent criminal defendant to challenge each successive appointment of counsel, delaying indefinitely the criminal prosecution." (Ibid.)
Following and applying Horton, we conclude that the mere filing of a petition for habeas corpus, even if premised on an allegation of ineffectiveness of trial counsel, does not necessarily create a conflict of interest between that attorney and his or her client in subsequent proceedings. Rather, only if the circumstances demonstrate an actual conflict of interest between the two is disqualification required.
The trial court here concluded that defendant's complaints regarding his attorney set forth in the writ petition stemmed from disgruntlement with the verdict, a result we note that is supported by ample evidence, and did not create an actual conflict with regard to counsel's continued representation of defendant during posttrial proceedings. This finding is entirely reasonable. There is no indication in the record that defense counsel's representation of defendant at trial was prejudicially deficient; nothing contradicts the court's implicit conclusion that the writ petition was frivolous. Exhibiting shrewd common sense, the trial court cogently explained, "There's always questions about trial strategy and every losing defendant would be in the same position to immediately have attorney appointed to cross-check and second guess trial attorney's performance in a losing trial."
*781 Contrary to defendant's representation on appeal, there is no evidence in the record showing that defense counsel did not file a motion for new trial because of the pending writ petition. Likewise, there is no record support for defendant's assertion that defense counsel was "obviously bitter and fearful of [defendant's] seeking review of her ineffectiveness and his complaints." To the contrary, defense counsel unequivocally informed the court that she was willing to continue representing defendant "if the Court wants me to." Subsequent to this hearing, defense counsel filed and argued a motion to strike defendant's prior convictions and ably represented him at sentencing.
For these reasons, we conclude that the motion to withdraw was properly denied; abuse of discretion has not been shown. (People v. Horton, supra, 11 Cal.4th at pp. 1104-1107, 47 Cal.Rptr.2d 516, 906 P.2d 478; see also People v. Carr (1972) 8 Cal.3d 287, 299, 104 Cal.Rptr. 705, 502 P.2d 513; Ng v. Superior Court (1997) 52 Cal.App.4th 1010, 1021-1023, 61 Cal. Rptr.2d 49.)

IV. The trial court was not obligated to interpret defendant's in propria persona motions for new trial as Marsden motions.[***]

DISPOSITION
The judgment is affirmed.
ARDAIZ, P.J., and VARTABEDIAN, J., concur.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II and IV.
[1] Unless otherwise noted, all statutory references are to the Penal Code.
[2] The detox cell at the Taft police station is a roughly triangular room which has a toilet but no other furniture. The floor is covered with a rubberized coating.
[3] While defendant perfunctorily asserts that his rights under the Sixth and Fourteenth Amendments were infringed, he does not support this position with argument and citation to legal authority. We therefore find the point to be insufficiently developed to be cognizable and decline to address the issue. (People v. Turner (1994) 8 Cal.4th 137, 214, fn. 19, 32 Cal.Rptr.2d 762, 878 P.2d 521; People v. Williams (1997) 16 Cal.4th 153, 206, 66 Cal.Rptr.2d 123, 940 P.2d 710; People v. Hardy (1992) 2 Cal.4th 86, 150, 5 Cal.Rptr.2d 796, 825 P.2d 781.)
[4] We dismiss defendant's complaint that he could not sit fully against the back of his chair
[5] In the course of ruling on this motion, the court commented that wearing a stun belt was in defendant's best interest. Other than a passing reference to this comment in his opening brief, defendant did not attach any particular significance to the remark. No independent legal argument was raised or developed in connection with the comment. Rather, he simply asserted that denial of his request to remove the stun belt while he testified was an abuse of discretion. As explained, ante, we disagree. We address only those contentions which defendant has raised and developed with proper legal argument and citation to authority. This court is not obligated to, and will not, litigate on defendant's behalf. (People v. Hardy, supra, 2 Cal.4th at p. 150, 5 Cal.Rptr.2d 796, 825 P.2d 781.) It is therefore unnecessary to address the legal propriety of this remark. (People v. Williams, supra, 16 Cal.4th at p. 206, 66 Cal. Rptr.2d 123, 940 P.2d 710.)
[**] See footnote *, ante.
[9] The record on appeal does not contain any documentary proof supporting the assertion that defendant petitioned an appellate court, either federal or state, for a writ of habeas corpus. However, this court's records show that defendant filed a petition for writ of habeas corpus in this court on May 27, 1997; the petition was denied on June 6, 1997 (In re Mar (June 6, 1997. F028400)[nonpub. opn.]).
[10] Defendant wisely did not argue on appeal that his stubborn refusal to cooperate with counsel mandated appointment of alternative counsel.
[11] Defendant's attempt to differentiate Horton ignores the second basis supporting the decision, focusing exclusively on the fact that the petition was still pending at the time of the hearing. Defendant's circumscribed reading of Horton is disingenuous and we are unpersuaded by his argument on this point.
[***] See footnote *, ante.