Ronnie HAWKINS, individually and as the representative of the class of persons defined in averment 16, Plaintiff–Appellee,

v.

Joan COMPARET–CASSANI; Los Angeles Municipal Court; LA Superior Court; Sherman Block; County of Los Angeles; Jane Doe 1; 100 Unknown Named Defendants; Donna Jacobs, Defendants,

and

Sherman Block, former Sheriff, who is now deceased, but does not yet have a personal representative, Defendant–Appellant,

and

Lee Baca, newly elected Sheriff, Real-party-in-interest-Appellant.

Nos. 99–55187, 99–55394.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 2, 1999

Filed May 30, 2001

Michael D. Fitts, (briefed and argued) Greines, Martin, Stein & Richland LLP, Beverly Hills, California; Kevin C. Brazile, Deputy County Counsel, County of Los Angeles, Los Angeles, California, for the defendant-appellant.

Stephen Yagman, Joseph Reichmann, Marion R. Yagman, Kathryn S. Bloomingfield, Yagman & Yagman & Reichmann, Venice Beach, California, Richard H. Millard, Los Angeles, California, for the plaintiff-appellee.

Lowell V. Sturgill, Jr., U.S. Dept. of justice, Civ. Div., Appellate Staff, Washington, DC, for amicus Curiae United States.

Paul L. Hoffman, Bostwick & Hoffman, LLP, Santa Monica, CA, and William J. Aceves, San Diego, California, for amicus curiae Amnesty International.

Before: BROWNING and TASHIMA, Circuit Judges, and KING, District Judge.[1]

JAMES R. BROWNING, Circuit Judge:

Defendants Lee Baca, *et al.*, appeal a preliminary injunction prohibiting the use of a stun belt on prisoners appearing in Los Angeles County courts. We conclude the injunction was too broad, and remand for further proceedings.

---

1. Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

2. In a subsequent declaration, the presiding judge said she activated the belt because she "was afraid [Hawkins] was going to get up and try to attack either [her] or someone in the courtroom" and she noticed he was trying to remove the handcuff on his left arm. These concerns are not reflected in the sentencing hearing transcript, the relevant portion of which reads as follows:

THE COURT: AND THE RECORD SHOULD REFLECT THE DEFENDANT IS CONTINUING TO INTERRUPT THE COURT. WHEN THE DEFENDANT REFUSED TO RETURN TO THE COURTROOM AND PRESENT HIS CLOSING ARGUMENT, THE JURY WAS—

MR. HAWKINS: I ASKED TO BE BROUGHT BACK TO THE COURTROOM.

THE COURT: THE JURY WAS THEN GIVEN INSTRUCTIONS, AND THEY BEGAN THEIR DELIBERATION WITHOUT HIM—

MR. HAWKINS: I DID NOT IN OPEN—

THE COURT: —BECAUSE THE DEFENDANT CONTINUED TO BE IN OPEN TRIAL—

## I.

### Background

Plaintiff and Appellee Ronnie Hawkins was a convicted criminal defendant scheduled to appear for sentencing. Before the hearing, the bailiffs informed the presiding judge that Hawkins was "being difficult," "acting up in the lockup area," "violent," and "threatening to spit on deputies to give them A.I.D.S. because he was H.I.V. positive." Because of Hawkins' behavior and his previous threats of violence, the Los Angeles County Sheriff sought and secured an order authorizing placement of a "stun belt" on Hawkins during the hearing. The belt was activated during the hearing for the stated reason that "Hawkins made several statements out of order and acted in a generally disruptive manner."[2] *Hawkins v. Comparet–Cassani,* 33 F.Supp.2d 1244, 1248 (C.D.Cal.1999).

MR. HAWKINS: I REFUSED TO?

THE COURT: YOU ARE WEARING A VERY BAD INSTRUMENT, AND IF YOU WANT TO FEEL IT, YOU CAN, BUT STOP INTERRUPTING.

MR. HAWKINS: YOU ARE GOING TO ELECTROCUTE ME FOR TALKING?

THE COURT: NO, SIR, BUT THEY WILL ZAP YOU IF YOU KEEP DOING IT. THE DEFENDANT ALSO ALLEGES THAT THE COURT HAS AN EX PARTE CONTACT WITH THE D.A. THAT IS NOT TRUE, AND I AM NOT AWARE THAT THIS DEPUTY D.A.—

MR. HAWKINS: THE TRANSCRIPT WILL REFLECT THAT.

THE COURT: ONE MORE TIME. ONE MORE TIME. GO AHEAD.

MR. HAWKINS: THAT'S UNCONSTITUTIONAL.

(AT THIS TIME THE BELT WAS ACTIVATED.)

\*　　\*　　\*

MR. HAWKINS: I WOULD LIKE FOR THE RECORD TO REFLECT THAT AT THIS POINT I AM AFRAID TO SAY ANYTHING. I AM GOING TO GET ELECTROCUTED, SHOCK TREATMENTS FOR TALKING. I AM NOT—I HAVEN'T DISPLAYED ANY VIOLENCE, ANY DISRUPTIVE—

The device used upon Hawkins was a Remote Electronically Activated Control Technology (REACT) belt, which is a "remotely operated electronic restraint device" designed to cause an electric shock that will "disorient, temporarily immobilize and stun a person without causing permanent injuries." It can be activated by a law enforcement official up to 300 feet away using a remote control. Stun belts are used by the Sheriff's staff to control high-risk defendants in court, during transportation, and in other prison contexts. The belts are usually worn under a prisoner's clothing while in the courtroom.

When activated, the belt delivers a 50,-000–volt, three to four milliampere shock lasting eights seconds. Once the belt is activated, the electro-shock cannot be shortened. It causes incapacitation in the first few seconds and severe pain during the entire period. Activation may lead to involuntary defecation and urination; immobilization may cause the victim to fall to the ground. Other courts have found the shock can "cause muscular weakness for approximately 30–45 minutes," *see, e.g., People v. Melanson,* 937 P.2d 826, 835 (Colo.App.1996), and it is suspected of having triggered a fatal cardiac arrhythmia. *See* Shelley Dahlberg, Comment, *The React Security Belt: Stunning Prisoners and Human Rights Groups into Questioning Whether Its Use Is Permissible Under the U.S. and Texas Constitutions,* 30 St. Mary's L.J. 239, 251–52 (1998). The "belt's metal prongs may leave welts on the victim's skins" that take months to heal. *Id.* at 249.

According to the Sheriff's written policy, the belt may not be used on pregnant women or persons with heart diseases or muscular dystrophy, or to "unlawfully threaten, coerce, harass, taunt, belittle, injure, punish or abuse any person." The written policy statement also specifies the circumstances under which the belt may be used:

> The R.E.A.C.T. Belt may be placed around the waist of any prisoner whose actions pose a physical threat to the safety of deputies, a Judge or courtroom staff. The belt may only be placed on a prisoner under the following circumstances:
>
> i. An attempted escape while in custody or in a courtroom
>
> ii. Violent or assaultive behavior while in custody or in a courtroom
>
> iii. Documented past incidents of violent or assaultive behavior while in custody or in a courtroom.

> THE COURT: LOWER YOUR VOICE.
>
> MR. HAWKINS: I WILL BE ELECTRO-CUTED FOR TALKING TO [sic] LOUD?
>
> THE COURT: THAT IS THE WAY WE BEHAVE IN A COURTROOM. WE DON'T SHOUT. JUST LOWER YOUR VOICE.
>
> ＊ ＊ ＊
>
> MR. HAWKINS: I THINK YOU HAVE BEEN VERY UNFAIR. I THINK THESE ELECTRONIC SHOCKS TO ME WITHOUT DISPLAYING ANY VIOLENT BEHAVIOR—I THINK IT IS VERY INHUMANE ON YOUR PART.
>
> THE COURT: SIR, THERE WAS ONLY ONE BECAUSE YOU REFUSED TO OBEY MY ORDER TO STOP INTERRUPTING ME. SO DON'T MISSTATE THE RECORD. THERE WAS ONLY ONE, NOT PLURAL.
>
> MR. HAWKINS: BUT FOR A VERBAL INTERRUPTION, YOUR HONOR.
>
> THE COURT: YES, SIR, THAT IS EXACTLY RIGHT.
>
> MR. HAWKINS: THAT IS NOT WHAT THIS THING IS DESIGNED FOR. YOU ARE OVERSTEPPING YOUR AUTHORITY.
>
> THE COURT: NO. SIR, ANYTHING ELSE?

iv. Documented past incidents of escapes or attempted escape from custody or from a courtroom.

v. Documented incidents in which the person has threatened to escape or attempt to escape from custody; or has threatened violent or assaultive behavior while in custody.

vi. Documented or objectively observable evidence that the prisoner poses a threat because he/she is suffering from a mental disorder or disease.

vii. Overt acts or attempt [sic] to remove restraints or the R.E.A.C.T. Belt itself.

viii. The R.E.A.C.T. Belt may also be used pursuant to a facially valid court order communicated to Sheriff's personnel by the Judge.

Use of the stun belt in court "requires the approval of the Judge hearing the case."[3]

The written policy permits activation of the belt (i.e. stunning the wearer) under the following circumstances:

- Any attempt to escape or to assault the Court, courtroom staff, deputies or spectators.

- To prevent any battery or physical injury from being inflicted upon the Court, courtroom staff, deputies or spectators.

- Any attempt to remove the belt or other physical restraints.

- A facially valid court order issued by a Presiding Judge.

The policy requires that warnings be given where and when possible and that the prisoner receive immediate medical treatment after activation of the belt.

In Los Angeles County, the belt has been placed on approximately 200 detainees, at more than a thousand court proceedings. It has been activated on three people, including Hawkins, once apparently by accident.

## II.

### Proceedings Below

Hawkins filed suit against the presiding judge, the Los Angeles Municipal and Superior Courts, the Los Angeles County Sheriff, and the County of Los Angeles. He sought compensatory and punitive damages, a declaratory judgment that use of the stun belt is unconstitutional, and an injunction prohibiting the defendants from using the stun belt "on any person by any judge or law enforcement officer in Los Angeles County." In his claim for damages and injunctive and declaratory relief, Hawkins purported to represent, and moved to certify, a class consisting of all individuals in the custody of the Los Angeles County Sheriff who may be brought before a county superior or municipal court and required to wear a stun belt.

After a hearing, the district court filed an order granting in part and denying in part defendants' motion to dismiss, granting plaintiffs' motion for class certification, and granting plaintiffs' motion for preliminary injunction. *See Hawkins*, 33 F.Supp.2d at 1244.[4]

The district court granted Hawkins' motion to certify a class of all persons in the custody of the Los Angeles County Sheriff who are appearing in state court and may be subjected to use of the stun belt.[5] *Id.*

---

3. The Sheriff's policy notes that securing such judicial approval "could require a hearing to show good cause based on the ... potential for violence and disruption during the court proceding [sic]." The record does not indicate that any such show cause hearing was held before the use of the belt on Hawkins.

4. We cite the order as it existed in its published, pre-amendment form. The amendments are not material for purposes of the opinion.

5. The district court construed " 'use' to include either placement or activation of the stun belt on a prisoner." *Id.* at 1250 n. 1. We do the same.

**1236**

at 1260. The court found common issues of law and fact because "the issue is whether using stun belts is a per se constitutional violation." *Id.* at 1259. The court concluded that Hawkins' interests would not be antagonistic to the interests of other prisoners. *Id.* at 1260.

The preliminary injunction ordered the Los Angeles County Sheriff "not to seek a judicial order to either place or activate a stun belt on a prisoner in his custody pending the outcome of trial." *Id.* at 1262. The court concluded that the mere placement of the belt on a detainee raises "serious questions going to the merits of the Fourth Amendment and Eighth Amendment claims" and held that the balance of hardship tips in favor of the plaintiffs. *Id.* The court also addressed Sixth Amendment concerns, referring to the belt as a "pain infliction device that has the potential to compromise an individual's ability to participate in his or her own defense."[6] *Id.*

The Sheriff appealed the preliminary injunction and the class certification separately.[7] We granted the Sheriff's motion to consolidate.

## III.

### Standing

 Defendants challenge Hawkins' standing individually to seek injunctive relief, relying on *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). In *Lyons,* the Supreme Court denied standing where the plaintiff could not show a sufficient likelihood that he would be injured in the future by the police chokehold he sought to enjoin. *See id.* at 105–07, 103 S.Ct. 1660. In *LaDuke v. Nelson,* 762 F.2d 1318 (9th Cir.1985), we distinguished *Lyons* on three grounds equally applicable here. We focus our analysis on Hawkins' standing at the time the class was certified. Although Hawkins' individual claim may have since become moot,[8] the existence of the class preserves the live case or controversy demanded by Article III. *See United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 409, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980).[9]

First, there is a likelihood of recurrence. At the time of class certification, Hawkins remained imprisoned and in custody of Defendants. Since use of the belt is based on past conduct, Hawkins need not have been arrested or engaged in illegal behav-

---

6. Although the district court order does not explicitly refer to the Sixth Amendment, its lengthy discussion of a "defendant's ability to participate in his own defense" speaks to the Sixth Amendment concern. *See generally Faretta v. California,* 422 U.S. 806, 818–832, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). In any case, the question is fairly before us since plaintiffs argued their Sixth Amendment claim below and have briefed it on appeal. *See Spokane County v. Air Base Housing, Inc.,* 304 F.2d 494, 497 (9th Cir.1962) (affirmance may be based on any theory argued below, even if the district court decided the matter on a different ground).

7. We granted the Sheriff's motion for permission to take an interlocutory appeal under Fed.R.Civ.P. 23(f) from the class certification order.

8. Given that more than two years has elapsed since the preliminary injunction was granted, it seems unlikely that Hawkins would remain in a county jail.

9. Indeed, for the subclass of pretrial detainees to whom the Fourth Amendment claim is confined, class membership may be "so inherently transitory that trial court will not even have enough time to rule on a motion for class certification before the proposed representative's individual interest expires," *id.* at 410, 100 S.Ct. 1202; their claim would fall within the exception recognized in *Gerstein v. Pugh,* 420 U.S. 103, 110 n. 11, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), for cases "capable of repetition, yet evading review."

ior to subject him to its use. *Cf. Hodgers–Durgin v. De La Vina,* 199 F.3d 1037, 1041 (9th Cir.1999) (en banc) (distinguishing *Lyons* based on legality of plaintiffs' conduct). Under the Sheriff's policy, Hawkins needed only to enter a Los Angeles courtroom to justify use of the belt.[10] As his history demonstrates, this prospect was not remote. Even now, Hawkins may wish to pursue state habeas claims or seek other post-conviction relief that would bring him once more before the Los Angeles courts.[11]

Second, unlike the chokehold in *Lyons,* use of the belt stems from the Sheriff's official written policy. *Cf. LaDuke,* 762 F.2d at 1324. Third, as in *LaDuke* but not in *Lyons,* Hawkins was seeking injunctive relief on behalf of a class. Although Hawkins had to establish standing personally before obtaining class certification, it is not irrelevant that he sought to represent broader interests than his own. *See id.* at 1325.

Unlike *LaDuke,* and like *Lyons,* this case involves an injunction of state law enforcement matters and thus raises federalism considerations. However, unlike *Lyons* Hawkins demonstrated the likelihood of irreparable injury in the absence of injunctive relief. *Cf.* 461 U.S. at 112, 103 S.Ct. 1660. Therefore, because Hawkins met the other three *LaDuke* factors, we conclude that Hawkins, individually, had standing to enjoin Defendants from using the stun belt on him.[12]

## IV.

### Class Certification

 A district court's decision regarding class certification is reviewed for abuse of discretion. *See Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir. 1996). A court abuses its discretion if its certification order is premised on legal error. *See Knight v. Kenai Peninsula Borough Sch. Dist.,* 131 F.3d 807, 816–17 (9th Cir.1997).

The Federal Rules of Civil Procedure allow class certification if the proponent shows:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties

---

10. Hawkins satisfies at least two of the criteria for use of the stun belt under the Sheriff's policy guidelines: "[d]ocumented past incidents of violent or assaultive behavior while in custody or in a courtroom" and "threatened violent or assaultive behavior while in custody." In addition, Hawkins' prison file presumably includes the presiding judge's declaration that she saw him trying to remove the handcuff on his left arm. If so, Hawkins would also meet a third criteria under the guidelines: "[o]vert acts or attempt[s] to remove restraints."

That Los Angeles County apparently did not use the belt on Hawkins during his subsequent courtroom appearances (after his lawsuit was filed) does not alter the fact that it retains the discretion to do so in the future.

*See United States v. Generix Drug Corp.,* 460 U.S. 453, 456 n. 6, 103 S.Ct. 1298, 75 L.Ed.2d 198 (1983) (voluntary cessation does not moot claim where defendant remains free to resume challenged practice).

11. By comparison, for the plaintiff in *Lyons* to be injured again, he would have needed to be stopped by the police and to "provoke the use of a [non-standard] chokehold by resisting arrest, attempting to escape, or threatening deadly force," a prospect which the Supreme Court described as "no more than speculation." 461 U.S. at 108, 103 S.Ct. 1660.

12. Standing issues relevant to the class are addressed in the section on class certification, which follows. *See infra* part IV.

will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

The district court granted class certification and allowed Hawkins to represent "all persons who (1) are in custody of the Los Angeles County Sheriff, (2) are appearing in either a Los Angeles County municipal or superior court, (3) who engage in conduct that is perceived to be disruptive, and (4) upon whom the custodial officer may subject use of the stun belt." *Hawkins,* 33 F.Supp.2d at 1260.

■ We agree with the district court that the number of people who fall within the class is sufficient to meet the numerosity requirement of Rule 23(a). A class action eliminates the need for cumbersome, individual litigation regarding the constitutionality of use of the stun belt. There are also questions of law or fact common to the class: All class members face the prospect of having the stun belt placed on them while in court and challenge the constitutionality of such belt usage; all have standing to bring Sixth (and, possibly, First) Amendment claims that raise substantially similar issues.

■ However, the class certified is defective. Hawkins, a convicted prisoner, was granted class representative status over both convicted and non-convicted prisoners and presents some claims that are not typical of all class members: He raises an Eighth Amendment claim, which is reserved for "those convicted of crimes" and therefore would not apply to pre-trial detainees. *Whitley v. Albers,* 475 U.S. 312, 318, 106 S.Ct. 1078, 89 L.Ed.2d 251

(1986); *Ingraham v. Wright,* 430 U.S. 651, 671–72 n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). As a convicted prisoner, Hawkins himself cannot bring a Fourth Amendment claim, which applies only to those not yet convicted. *See Graham v. Connor,* 490 U.S. 386, 395 & n. 10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). A named plaintiff cannot represent a class alleging constitutional claims that the named plaintiff does not have standing to raise. *See O'Shea v. Littleton,* 414 U.S. 488, 493–94, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). It is not enough that the class members share other claims in common.

■ Therefore, the district court erred in granting class certification to the entire class as regards the claims brought under the Fourth and Eighth Amendments.[13] These claims can be maintained in a class action only by certifying subclasses, with appropriate representation. *See Betts v. Reliable Collection Agency, Ltd.,* 659 F.2d 1000 (9th Cir.1981). On remand, Plaintiffs must determine whether to separate non-convicted and convicted class members and seek appointment of a new class representative to represent the non-convicted prisoners, or to otherwise refashion this action to remedy the class defects. *See* Fed. R.Civ.P. 23(c)(4); *see also Marisol A. v. Giuliani,* 126 F.3d 372, 378 (2d Cir.1997). The district court is not "to bear the burden of constructing subclasses" or otherwise correcting Rule 23(a) problems; rather, the burden is on Plaintiffs to submit proposals to the court. *United States Parole Commission v. Geraghty,* 445 U.S. 388, 408, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980).

---

**13.** The class certified may be defective for another reason. Appellants argue that some class members would prefer to wear a stun belt over other, more visible methods of restraint such as shackles. *Cf. United States v. Collins,* 109 F.3d 1413, 1418 (9th Cir.1997) (defendant requested "taser belt" instead of shackles). Appellants contend that such class members, if any exist, would oppose the lawsuit's aim of barring even voluntary wearing of the belt. Given the interlocutory nature of this appeal and the district court's discretion in these matters, however, we decline to reverse either the class certification or the injunction based on this speculative problem.

## V.

### The Preliminary Injunction

Because Hawkins, the only named plaintiff, cannot bring a Fourth Amendment claim, the preliminary injunction must stand, if at all, on the Sixth and Eighth Amendments. We conclude that the injunction is justified under the Sixth Amendment, but only in a narrower form that does not bar using the belt where necessary to protect courtroom security.[14]

 A preliminary injunction will be reversed only if the district court abused its discretion. "It will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Gregorio T. v. Wilson,* 59 F.3d 1002, 1004 (9th Cir.1995) (internal citations and quotes omitted). A preliminary injunction must be supported by findings of fact, which are reviewed for clear error. *See Coalition for Economic Equity v. Wilson,* 122 F.3d 692, 701 (9th Cir.1997); Schwarzer, Tashima et. al., *Federal Civil Procedure Before Trial,* ¶ 13:176, at 13–57 (2000).

 The district court found that the belt had a "chilling effect," deterring defendants from participating in their own defense. 33 F.Supp.2d at 1262. The court

noted that the boundary "between aggressive advocacy and a breach of order" is "inherently difficult to define," and found that defendants might refrain from the former out of fear of "being subjected to the pain of a 50,000 volt jolt of electricity" should their conduct cross the line.[15] *Id.* Indeed, the psychological toll exacted by such constant fear is one of the selling points made by the manufacturer of the belt. *See* Dahlberg, *supra,* at 252 (citing Stun–Tech literature promoting "total psychological supremacy [over] troublesome prisoners").

If the belt is activated, the defense is "likely to be even more compromised," leaving the defendant unable "to meaningfully participate in the proceeding." 33 F.Supp.2d at 1262. Accidental activations, although rare, have been documented on more than one occasion. *See, e.g., State v. Wachholtz,* 131 Idaho 74, 952 P.2d 396, 398 (Ct.App.1998); *State v. Filiaggi,* 86 Ohio St.3d 230, 714 N.E.2d 867, 875 (1999); *see also* Dahlberg, *supra,* at 289 (reporting at least nine accidental activations nationwide in initial years of use). The record indicates at least one such unintentional activation has occurred in Los Angeles County.

The district court's findings are credible, largely uncontested, and consistent with other reported opinions.[16] The "chilling

---

14. Because we affirm the injunction, in part, under the Sixth Amendment, we need not consider the Eighth Amendment claim, except to hold that it offers no additional support for the injunction beyond that provided by the Sixth. *Cf. Michenfelder v. Sumner,* 860 F.2d 328 (9th Cir.1988) (use of taser guns not cruel and unusual punishment).

15. Conceivably, the "chilling effect" on advocacy may be reduced in proceedings in which the defendant plays a purely passive role-i.e. neither acts pro se nor testifies. Therefore, use of the belt may be more acceptable where such a passive role is anticipated. Although the district court made no findings in this

regard, the record can be further developed upon remand to determine the possible relevance of such considerations to the injunction.

16. *See People v. Mar,* 92 Cal.Rptr.2d 771 (2000) (finding belt acted as a "psychological restraint" that impeded defendant's testimony); *People v. Melanson,* 937 P.2d 826, 836 (Colo.App.1997) (accepting in principle claim that defendant's fear of the belt could prevent him from "participat[ing] fully and meaningfully in his trial," but concluding that "the trial court ... took appropriate steps here to assuage those concerns"); *see also United States v. Simmonds,* 179 F.R.D. 308, 312 n. 2

effect" the court describes obviously prejudices a defendant's Sixth Amendment's guarantee of a fair trial. We therefore sympathize with the district court's conclusion that a device with such dangerous potential "does not belong in a court of law." 33 F.Supp.2d at 1262. However, the district court's findings of prejudice do not support its conclusion that serious questions exist as to whether use of the stun belt constitutes a per se violation of the Sixth Amendment, even used to protect the security of the courtroom and its occupants.

In analyzing the belt's Sixth Amendment implications, there is an important difference between verbal disruption and conduct that threatens courtroom security.[17] The district court's findings address only use of the belt in dealing with conduct that is potentially disruptive. The court concluded that because the line between aggressive advocacy and expression disruptive to courtroom order is not always clear, defendants may be deterred from engaging in forceful, but permissible advocacy for fear of being stunned if they cross the line. *See* 33 F.Supp.2d at 1262. However,

threats of violence or escape are sufficiently identifiable to permit a defendant to advocate his cause without fear that excessive zealousness will be mistaken for such a threat. The district court's concerns about the belt's "chilling effect" would be far less than compelling if use of the belt were restricted to preventing violence or escape.[18]

The rights of the accused must be balanced against the safety of the court and those who work in it. Even if use of the belt for security purposes did have some potential to prejudice defendants, the district court would need to consider whether the alternatives are less prejudicial.[19] As this court has noted, other methods of restraint have serious drawbacks of their own.

■ For example, the use of shackles may prejudice a defendant in the eyes of the jury by impairing the presumption of innocence. *See Duckett v. Godinez,* 67 F.3d 734, 747 (9th Cir.1995); *Spain v. Rushen,* 883 F.2d 712, 721 (9th Cir.1989). Even at sentencing, where a defendant's guilt is no longer in dispute, we have held

(D.Colo.1998) (noting defendant's allusion to fear of stun belt as factor in his coercion claim); *People v. Garcia,* 56 Cal.App.4th 1349, 66 Cal.Rptr.2d 350 (1997) (refusing to hear claim that belt qualified as psychological restraint because it had not been argued below); Jerry Shnay, *Stun Technology Keeps Courtroom Defendants in Line, Chicago Tribune,* December 16, 1996, at 7B (defense attorney claims fear of belt prevented client from participating in defense).

17. This distinction is forcefully presented to us by the United States amicus brief. In addition, Hawkins' colloquy with the judge before and after the belt was activated demonstrates that Hawkins himself was keenly aware of the dividing line between threats of violence and merely verbal disruption. *See supra* note 2. N.B.: In referring to "security threats," we intend a broad sense of the term that embraces the risk of both violence and escape.

18. The actual determinant of the "chill" would presumably be the defendant's own subjective beliefs as to the circumstances under which the belt would be activated. Defendants who believed that advocacy alone could lead to activation of the belt would still be deterred accordingly. However, the Sheriff's policy appears to require that prisoners be instructed as to the criteria under which the belt would activated when the belt is first placed on them, and it is reasonable to assume that the deterrent effect is largely determined by these criteria.

19. The district court identified three alternative methods for handling "disruptive" defendants, but does not address the options where security is at stake. 33 F.Supp.2d at 1262 (citing *Illinois v. Allen,* 397 U.S. 337, 343–44, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)).

that shackling "is an inherently prejudicial practice" that "detract[s] from the dignity and decorum of the proceeding and impede[s] the defendant's ability to communicate with his counsel." *Duckett*, 67 F.3d at 747. In addition, shackles "may confuse and embarrass the defendant," *id.* at 748, and can cause significant pain if worn over the course of a prolonged trial. *See Spain*, 883 F.2d at 723–26 (debilitating back pain caused by wearing 25 pounds of shackles 10–12 hours per day over five-year pretrial and trial left defendant unable to participate in his own defense). Conversely, less extensive shackling may prove ineffective. *See King v. Rowland*, 977 F.2d 1354, 1358 (9th Cir.1992) (defendant able to attack attorney while restrained in leg irons).

Removing prisoners from the courtroom is also problematic since it necessarily limits their Sixth Amendment right to presence.[20] *See Allen*, 397 U.S. at 341–43, 90 S.Ct. 1057. This is so particularly where a defendant is acting pro se. *See, e.g. Hamilton v. Vasquez*, 17 F.3d 1149, 1155 (9th Cir.1994).[21]

The prejudice associated with these alternative methods of control is accentuated when they are relied on for security purposes. Although disruptive conduct may be addressed by merely temporary restraints or removal, when premised on a security risk, the need for prophylactic measures is likely to continue throughout the trial. *Compare Allen*, 397 U.S. at 343, 90 S.Ct. at 1061 ("Once lost, the right to be present can ... be reclaimed as soon as the defendant is willing to conduct himself [appropriately]"), *with Spain*, 883 F.2d at 719 (security risk defendant shackled with 25 pounds of chains throughout five-year proceedings). As already noted, prolonged shackling can have a compound impact that is disproportionately prejudicial. *See Spain*, 883 F.2d at 723–26 (pain from shackles prevented defendant's from participating in his defense). The prejudicial effect of a prolonged exclusion from the courtroom could be similarly disproportionate. *See id.* at 737–739 (Noonan, J., dissenting) (arguing that conducting trial in absentia is no better than long-term shackling).[22]

Moreover, whereas restraint or removal of disruptive defendants is generally based on their misconduct in the immediate trial, security risk can be premised on past behavior, as the Sheriff's policy explicitly states. *See Wilson v. McCarthy*, 770 F.2d 1482, 1485 (9th Cir.1985) (security risk based on prior, out-of-court record). Concern that the presumption of innocence may be jeopardized is more acute than

---

**20.** The district court's suggestion that courts could place unruly defendants in a separate room equipped with video links (33 F.Supp.2d at 1262) would only partially mitigate the prejudicial effects of removal. The defendants' participation in the trial proceedings would be inevitably diminished, and their absence from the courtroom could still prejudice them in the eyes of the jury. In any case, such teleconferencing capabilities may not be feasible in every courthouse.

**21.** Other options have their own drawbacks: Surrounding the defendant with security guards requires expensive manpower. *See* David Westman, Note: *Handling the Problem Criminal Defendant in the Courtroom: the Use of Physical Restraints and Expulsion in the Modern Era*, 2 San. Diego Just. J. 507, 524 (1994) (citing cost benefits of stun belt over guards). It can also prejudice the defendant in the jury's eye. *See Jones v. Meyer*, 899 F.2d 883, 885–86 (9th Cir.1990). Firearms can endanger third parties. The threat of contempt is likely to prove meaningless, particularly where the defendant already faces a lengthy prison term. *See Spain*, 883 F.2d at 726.

**22.** In contrast, there is no reason to think the prejudicial effect of stun belts increases over time. Indeed, the prejudice might even decrease as defendants become more comfortable with the idea of wearing the belt.

where restraints are justified contemporaneously. *Compare Spain*, 883 F.2d at 722 (visible restraints prejudiced defendant in jury's eyes), *with King*, 977 F.2d at 1358 (defendant's in-court misconduct negated prejudicial impact of restraints). A stun belt, being largely invisible to the jury, avoids such prejudice, unless and until it is activated.

The stun belt offers more effective protection of courtroom security than alternative methods. Activated by the touch of a button, it can neutralize a security threat instantly and remotely. So long as the prejudice resulting from its use is no greater than that of the alternatives, we should be reluctant to deny recourse to what may be a valuable tool in protecting courtroom security.

We have seen that in shifting the focus from disruption to security, the belt's "chilling" effect becomes less prejudicial and the alternatives more so. For this reason, the district court findings regarding disruption do not support the injunction in the context of security.[23] We therefore conclude that the district court abused its discretion in ruling that a serious question of a Sixth Amendment violation existed as to the use of stun belts to maintain courtroom security. To the extent the injunction prevents use of the belt for this purpose, it is overbroad.[24]

Mindful of the restraint that must be exercised when enjoining a state's adminis-

tration of its own criminal laws (*O'Shea*, 414 U.S. at 499–502, 94 S.Ct. 669), it is appropriate to inquire whether there is a need for an injunction at all. Might the experience of Hawkins be an aberration? If the belt is unlikely to be used in the future for a purpose other than the protection of courtroom security, then reversal of the injunction in that context would leave nothing left to enjoin.

The district court findings do not identify the precise circumstances in which the belt would be used. However, although the Sheriff's written policy suggests that the belt is primarily to be used where security is at risk, the policy permits both placement and activation of the belt "pursuant to a facially valid court order" even without a showing of cause. Moreover, in the event a show cause hearing is held regarding in-court use, the policy suggests the criteria be whether "there is a potential for violence and *disruption* during the court proceding [sic]" (emphasis added).[25] Therefore, the policy appears to contemplate use of the belt even in cases where no threat to security exists.

The belt has been placed on hundreds of prisoners pursuant to the Sheriff's policy. At this preliminary juncture, we can presume, given a lack of contrary evidence, that at least some of these placements were undertaken in the absence of a security risk, and that without injunctive relief, the belt would continue to be used on this

---

**23.** The district court did not make explicit findings as to the comparative prejudice of the various options to control disruption. However, its analysis makes clear that it saw the prejudice engendered by stun belts as far exceeding the alternatives. *See* 33 F.Supp.2d at 1262.

**24.** Upon remand, the district court, of course, remains free to reach a different conclusion based on additional findings once the trial proceeds.

**25.** This appears to be the one place the policy contemplates disruptiveness as a relevant criteria. However, given that disruptions are of no real concern in the other prison contexts in which the belt is used, it is significant that they should be mentioned in the only part of the policy specific to in-court usage. We note that in this respect Los Angeles County's policy mirrors others applied elsewhere in the state. *Cf. Garcia*, 56 Cal.App.4th at 1354, 66 Cal.Rptr.2d 350 (describing policy permitting activation of belt if the wearer "engages in . . . [a]ny outburst or quick movement").

basis. Therefore, the district court did not abuse its discretion in so far as the injunction serves to bar such non-security usage.[26]

Accordingly, we remand for modification of the injunction consistent with this opinion. *Cf. A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir.2001) (remanding for modification where preliminary injunction overbroad). Each party shall bear his own costs on appeal.

REVERSED, in part, and REMANDED.

---

**26.** Read literally, the terms of the injunction prevent the Sheriff from seeking a court order to place the belt on prisoners in his custody · but would not prevent the Sheriff from following such an order where issued sua sponte. On remand, the district court should consider whether additional modification of the injunction is necessary to address this contingency.